# SECURITY LAND AND EXPLORATION COMPANY v. BURNS.

## ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 127.   Argued January 19, 1904.—Decided February 29, 1904.

The general rule that in matters of boundaries natural monuments or objects will control courses and distances is not absolute and inexorable.

When the plat of a government survey is the result of, and founded upon a gross fraud, and there is actually no lake near the spot indicated thereon, and adopting the lake as it is actually located as a natural monument would increase the patentee's land fourfold, the false meander line can be regarded as a boundary, instead of a true meander line, and the patentee confined to the lots correctly described within the lines and distances of the plat of survey and of the field notes which he actually bought and paid for.

Where the patentee has in fact received and is in possession of all the land actually described in the lines and distances and is seeking for more on the theory that his plat of survey carries him to a natural boundary, a denial of that right on the ground that the plat was fraudulent, and that the natural boundary did not actually exist anywhere near the spot indicated, is a legal defence which can be set up by defendant in an action in ejectment, and it is not necessary to seek the aid of a court in equity to obtain a reformation of the patent.

THIS is an action of ejectment, commenced in the District Court of St. Louis County, in the State of Minnesota, to recover certain lands in that county described in the complaint. The trial was by the court, and judgment was entered for the de-

fendant, which was affirmed by the Supreme Court of Minnesota, and the plaintiff has sued out this writ of error to review that judgment. 87 Minnesota, 97.

The following facts (among others) were found by the trial court:

"1. That plaintiff is a corporation duly organized and existing under the laws of the State of Minnesota, and the defendants are husband and wife.

"2. In 1876, township fifty-seven north of range seventeen west, in St. Louis County, Minnesota, was ordered by the General Land Office of the United States to be surveyed, and a contract for the survey thereof was made by the United States surveyor general of the State of Minnesota with one H. S. Howe, who, by said contract, was constituted a deputy United States surveyor for said purpose. Under said contract said Howe was required and undertook and agreed to survey said township, to run out all section lines, and to set posts making all section and quarter section corners throughout said township where the same could be marked upon the ground, and accurately to meander and establish upon the ground meander posts of all lakes and streams found to exist within said township.

"3. Thereafter said Howe ran and marked the exterior lines of said township, except the south township line, which had been previously surveyed, and set posts at all section and quarter section corners on said three exterior lines. He also set a meander post upon the north line of said township as surveyed by him, where said line running west from the northeast corner of said township first encountered the shore of Ely Lake, or, as it is sometimes called, Cedar Island Lake.

"4. No survey of the interior of said township was ever made, and no section lines within said township were ever run by said Howe, with the possible exception of the west line of section 36 thereof, and no section or quarter section corners were ever located, established or marked by him (with the possible exception of the northwest corner of section 36 aforesaid), and

none of the streams or permanent lakes (of which there were several) within said township were meandered by him, and no posts of any description were ever set, nor any lines or bearing trees ever blazed, within said township, with the possible exception of a corner post at the northwest corner of said section 36.

"5. Said Howe made and filed with the United States surveyor general of the State of Minnesota what purported to be field notes of a survey of said township made by him under said contract, purporting to give the length and directions of all interior section lines in said township, the location of all sections and quarter section posts, and the bearing trees thereof, the character of the soil and timber in said township, and all other data and information required by the statutes of the United States and the rules of the United States General Land Office, to be ascertained and reported by deputy surveyors in due course of making surveys of public lands.

"6. With the exception of the description of the survey of the three exterior boundary lines of said township actually run by him, said field notes returned by said Howe were imaginary and fictitious, and the purported facts and data contained therein were not based upon any personal knowledge or inspection of the interior of said township, and were, in fact, false and erroneous.

"7. From said purported field notes it appears that there existed in the northerly part of said township, lying in sections 2, 3, 4, 9, 10 and 11 thereof, a lake known as Ely Lake, or Cedar Island Lake, with surface area, as indicated in said field notes, of eighteen hundred acres; in fact, instead of having an area of about eighteen hundred acres, said lake then was and still is a body of water not exceeding eight hundred acres in area. It is a permanent, deep and navigable lake, having high, steep and heavily timbered banks, except about the outlet thereof. Said lake does not, in fact, touch section 11 at all, and covers only an area of very small extent (less than one-half of a forty-acre tract) in the southeast corner of sec-

tion 4. Between the actual water line of said lake and the meander line thereof, as returned by the purported field notes of said Howe, there were at the time of the survey, and still are, at least one thousand acres of high, tillable land, which has never been a part of the lake, and which was and is heavily timbered with trees of more than a century's growth and growing down to the water's edge.

"8. The field notes and report-of survey made and filed by said Howe were approved by the surveyor general for the district of Minnesota, August 7, 1876, and a plat of said township was made in accordance with said purported field notes under the direction of said surveyor general, and was approved by him on said 7th day of August, 1876, and a duly certified copy thereof was transmitted by him to the proper local United States land office on the 24th day of August, 1876, and another duly certified copy of the same was by him forwarded to the General Land Office of the United States, and filed therein August 23, 1876, and was by that office accepted as representing a correct survey of said township and as the official plat thereof. Such survey and plat of said township were the only ones ever made by or under the authority of the United States government."

[The plat, which is to be found at page 43 of 189 United States Reports, illustrates with sufficient accuracy the township in which the lands in question lie, and it delineates the meandering of Cedar Island Lake, the outer meander line representing that which was marked on the official plat of the survey and as shown by the field notes of Howe, and the inner meander line representing the lake as it actually existed in 1876, when the field notes were made and filed, and as it now exists. A portion of the land lying between these lines is the land involved in this action, being land lying between the lake and the lots 3, 5, 6 and 7, in section 4, of the township mentioned.

The dotted lines on the plat show the courses which would have to be followed in order to permit each of the lots above named to reach the lake as it actually exists.]

"9. Since the spring of 1892, the defendants have been in actual and continuous occupancy of a portion of the land lying between the meander line described and returned by said Howe in his said purported field notes, and as located upon the government plat of said township, and the actual water line of said lake. Said occupancy has been under the claim that the lands occupied by said defendants were and are unsurveyed government lands subject to homestead entry, and that they have not been patented by the government. The defendants have made valuable and lasting improvements upon the lands occupied by them respectively,

"10. According to the plat of said township, the land in section 4 was divided into eight fractional government lots, lots 1, 2 and 8 comprising all of the land in the east half of said section, containing an aggregate of 122.3 acres, and lots 3, 4, 5, 6 and 7 containing an aggregate of 182.08 acres, comprising all of the land in the west half of said section.

"11. Between December, 1879, and March, 1887, all of said government lots [and all the surveyed lands within said township] were patented and conveyed by the United States, pursuant to the laws relating to the disposal of public lands, and by patents containing the usual clause, 'according to the official plat of the survey of said lands returned to the General Land Office by the surveyor general.' By divers mesne conveyances from said patentees, the title to said lots 3, 5, 6 and 7, containing according to said plat and to the patents of said lands, the following quantities of land, respectively: Lot 3, 50.37 acres; lot 5, 34.75 acres; lot 6, 30.5 acres; and lot 7, 25.25 acres; became vested in the plaintiff in the year 1891 and prior to the commencement of the actions; and the plaintiff is still the owner thereof, and, as such owner, has within the boundary of said lots, as shown upon said plat, and within the meander line of said lake described in said field notes, the full quantity of land above described as contained therein.

"    *    *    *    *    *    *    *    *

"If the side lines of said lot three were produced and ex-

tended in straight lines southerly from its southern boundary, as shown upon the government plat, and as herein found and determined, and the said lot was so extended to the southerly boundary of said section 4, then in that event the said lot would not touch said Ely Lake, nor would there be any lake frontage thereon, and said lot would then contain one hundred and sixty acres of land; neither would said lines nor said lot reach said lake, no matter how far extended.

"If the side lines of said lot five were produced and extended easterly from the eastern boundary of said lot, as shown upon the government plat, and as herein found and determined, to the eastern boundary of said section 4, the northern line of said lot following the old meander line of said lake, and the southern line of said lot being produced and extended in a straight line, and said lot was so extended, then in that event the said lot would not touch said Ely Lake, nor would there be any lake frontage thereon, and said lot would contain about one hundred and twelve acres of land.

"If the side lines of lot six were produced and extended in straight lines easterly from the eastern boundary of said lot, as shown upon the government plat and as herein found and determined, to the eastern boundary of section 4, and said lot was so extended, then in that event the said lot would not touch said Ely Lake, nor would there be any lake frontage thereon, and said lot would then contain one hundred and sixty acres of land.

"If the side lines of said lot seven were produced and extended in straight lines easterly from its eastern boundary, as shown upon the government plat and as herein found and determined, in the eastern boundary of said section 4, and the said lot was so extended, in that event the south line of said lot would touch said Ely Lake, and a few feet of lake frontage would then be contained in said lot, and said lot would contain about one hundred and thirty-nine acres of land.

"I further find that it would be impossible to extend said lots within their respective side lines, as above specified, with-

out instant and irreconcilable interference with each other, and that no one of said lots has any prior or superior right over any of the others to be so extended."

*Mr. William W. Billson,* with whom *Mr. Chester A. Congdon* was on the brief, for plaintiff in error:

Monuments prevail over courses, distances and quantities. *Grier* v. *Penna Coal Co.,* 128 Pa. St. 79, 95; Rev. Stat. 2396; Public Domain, A. D. 1885, 598, 604.

When lands are granted according to an official plat of the survey of such lands, the plat itself, *with all its notes, lines, descriptions and land marks,* becomes as much a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself. *Cragin* v. *Powell,* 128 U. S. 691; *Noonan* v. *Lee,* 2 Black, 499, 504; *Hardin* v. *Jordan,* 140 U. S. 371, 380; *County of St. Clair* v. *Livingston,* 23 Wall. 46, 63; *Chapman* v. *Polock,* 11 Pac. Rep. (Cal.) 764; *Vance* v. *Fore,* 24 California, 436; *Jefferies* v. *East Omaha Land Co.,* 134 U. S. 178, 194; *McIver's Lessee* v. *Walker,* 9 Cranch, 173; *Barclay* v. *Howell's Lessee,* 6 Pet. 498, 510.

It is a *universal* rule that course and distance yield to natural and ascertained objects. *Preston's Heirs* v. *Bowmar,* 6 Wheat. 582; *Brown* v. *Huger,* 21 How. 305, 318; *Higueras* v. *United States,* 5 Wall. 827, 835; *Morrow* v. *Whitney,* 95 U. S. 551, 555; *Gerrard* v. *Silver Peak Mines,* 82 Fed. Rep. 578, 585; *Nelson* v. *Hall,* 1 McLean, 518; *S. C.,* Fed. Cas. No. 10,107; *Koons* v. *Bryson,* 69 Fed. Rep. 297; *Robinson* v. *Moore,* 4 McLean, 279; *S. C.,* Fed. Cas. No. 11,960; *Kirwan* v. *Murphy,* 83 Fed. Rep. 275; *Jones* v. *Martin,* 35 Fed. Rep. 348; *Ellenworth* v. *Standcliff,* 42 Fed. Rep. 316; *United States* v. *Murray,* 41 Fed. Rep. 468; *Whitehurst* v. *McDowel,* 53 Fed. Rep. 633; *McDowel* v. *Whitehurst,* 47 Fed. Rep. 757; *S. C.,* 103 Fed. Rep. 157; *S. C.,* 109 Fed. Rep. 354; *Belden* v. *Hebbard,* 103 Fed. Rep. 532, 541; *Ex parte Davidson,* 57 Fed. Rep. 883.

The rule has been repeatedly enforced in cases involving

larger discrepancies than in this case. *Newsom* v. *Pryor's Lessee*, 7 Wheat. 7; *Ayers* v. *Watson*, 113 U. S. 594; *Land Co.* v. *Saunders*, 103 U. S. 316; *Chinoweth* v. *Haskell's Lessee*, 3 Pet. 92, 98; *Horne* v. *Smith*, 159 U. S. 40; *Mitchell* v. *Smale*, 140 U. S. 406; *Simm's Lessee* v. *Baker*, Cooke (Tenn.), 146; *White-side* v. *Singleton*, Meigs (Tenn.), 207, 218; *Overton's Heirs* v. *Cannon*, 2 Humph. 264; *Fowler* v. *Nixon*, 7 Heisk. 719, 724; *Sturgeon* v. *Floyd*, 3 Rich. 80; *Simpkins* v. *Wells*, 19 Ky. L. R. 881; *Pitman* v. *Nunnelly*, 17 Ky. L. R. 793; *President &c.* v. *Clark*, 31 N. Car. (Iredell) 58.

The principle is uniformly recognized in the Minnesota cases. *Turnbull* v. *Schroeder*, 29 Minnesota, 49, 51; *Nicolin* v. *Schuer-derham*, 37 Minnesota, 63; *Chan* v. *Brandt*, 45 Minnesota, 93.

Monuments have been enforced against the courses and distances although it appeared with exceptional distinctness that the result was to pass more land than the parties had designed. *Pringle* v. *Rogers*, 193 Pa. St. 94, 98; *Sackett* v. *Twining*, 18 Pennsylvania, 199; *Johnston* v. *House*, 2 Hayw. (N. C.) 301; *Deaver* v. *Jones*, 119 N. C. 598; *Gilman* v. *Riopelle*, 18 Michigan, 145, 164; *Willoughby* v. *Foster*, Dyer, 80b; *Llewellyn* v. *Earl of Jersey*, 11 M. & W. 183, 188; *Reddick* v. *Leggat*, 7 N. Car. 539; *Chandler* v. *McCard*, 38 Maine, 564; 11 U. Can. O. B. 631; Rawle on Covenants (5th ed.), 297; *Dunn* v. *Turner*, 3 U. C. Com. Pl. 104; *Doe dem Murray* v. *Smith*, 5 U. S. 225.

The rule of monumental supremacy when viewed in the light of its true reason, is seen to be necessarily a universal rule of interpretation. Ross, Early Land Holding among the Germans, 13, 149, 150. See Rev. Stat. § 2396; Public Domain, 1883, 468, 590; *Cox* v. *Couch*, 8 Pa. St. 147, 154; *Blasdell* v. *Bissell*, 6 Pa. St. 258; *Wood* v. *Appal*, 63 Pa. St. 222; *Yoder* v. *Fleming*, 2 Yeates, 311; *Hall* v. *Powell*, 4 Serg. & R. 456, 461; *Doe* v. *Paine*, 4 Hawks, 65, 71; *Cherry* v. *Slade*, 3 Murphy, 82, 86; *Deaver* v. *Jones*, 119 N. Car. 598; *Miller* v. *White*, 1 N. Car. 223; *McClintock* v. *Rogers*, 11 Illinois, 279, 296; *Baxter* v.

*Evell's Lessee,* 7 Mon. (Ky.) 329; *Ayres* v. *Watson,* 137 U. S. 584, 597; *Chinoweth* v. *Haskell,* 3 Pet. 92, 96.   Cases on defendant's brief distinguished.

In some jurisdictions the rule may have degenerated.   Early cases in New York held that monuments were supreme. *Jackson* v. *Camp,* 1 Cow. 605, 612; *Jackson* v. *Frost,* 5 Cow. 346, 349; *Jackson* v. *Ives,* 9 Cow. 661; *Cudney* v. *Early,* 4 Paige, 209, 212; *Jackson* v. *McConnell,* 19 Wend. 175.

Afterwards by losing sight as above mentioned, of the reason and foundation of the rule, they held that where the courses and distances coincide with designated quantity, their accuracy is verified, with the effect of denuding the monuments of their supremacy. *Baldwin* v. *Brown,* 16 N. Y. 359; *Buffalo, etc., Co.* v. *Stigeler,* 61 N. Y. 348; *Higinbotham* v. *Stoddard,* 72 N. Y. 95, 99; *Danziger* v. *Boyd,* 21 J. & S. 398, 409.

As to Texas, see *Blum* v. *Bowman,* 30 U. S. App. 50, 54; *Booth* v. *Upshur,* 26 Texas, 64, 70; Oregon, *Hale* v. *Cottle,* 21 Oregon, 580, 585.

Prior to the decision of *Davis* v. *Rainsford,* 17 Massachusetts, 207, in 1821, the State enforced the rule in favor of monuments. *Howe* v. *Bass,* 2 Massachusetts, 380; *Pernam* v. *Weed,* 6 Massachusetts, 131.   But see *Parks* v. *Loomis,* 6 Gray, 467; *Murdock* v. *Chapman,* 9 Gray, 156; *Hall* v. *Eaton,* 139 Massachusetts, 217, 221.

These cases show that the relaxation of the rule has not extended beyond a very peculiar and narrow line of cases.

If by reason of the magnitude of the discrepancy or otherwise, the government is entitled to relief, it must be sought through reformation in equity. *White* v. *Burnley,* 20 How. 235; *Lamprey* v. *Mead,* 54 Minnesota, 290, 299; *Russell* v. *Maxwell Land Co.,* 158 U. S. 253; *Cragin* v. *Powell,* 128 U. S. 691; *Gazzan* v. *Phillips,* 20 How. 372; *White* v. *Blum,* 52 U. S. App. 59, 63; *Sears* v. *Parker,* 1 Hayw. (N. Car.) 126; *Fowler* v. *Nixon,* 7 Heisk. (Tenn.) 719, 725; *Curle* v. *Barrell,* 2 Sneed, 66; *Pringle* v. *Rogers,* 193 Pa. St. 94; *Hull* v. *Fuller,* 7 Vermont, 100, 105; *Owens* v. *Rains,* Hayw. (Tenn.) 106.

These propositions are established by the terms of the statute. § 2396, Rev. Stat.; *Ogilvie* v. *Copeland*, 145 Illinois, 98, 105.

In water frontage cases a monument is supported not only by its greater certainty, but by its greater materiality. A water boundary adds to the market value of a tract by aug- menting its usefulness for almost any purpose and the court will presume that it was one of the inducements to the pur- chase. *Newsom* v. *Prior's Lessee*, 7 Wheat. 7; *County of St. Clair* v. *Livingston*, 23 Wall. 46, 65.

All the equities are in favor of this contention. Errors in surveys were always claimed and generally allowed to the settler. *Taylor* v. *Brown*, 5 Cranch, 234, 249. It would be unjust to curtail the survey. *Beckly* v. *Bryan*, Sneed's Ky. Cas. 107; *Johnson* v. *Buffington*, 2 Wash. (Va.), 116; *Hous- ton* v. *Pillow*, 1 Yerg. 481, 488. The most the government could expect would be payment for excess acreage at original rate. *Lindsay* v. *Hawes*, 2 Black, 554, 560.

Complainants are not chargeable with notice of fraud on the part of the surveyor, or of the discrepancy in the acreage; nor if they are, would their rights be affected. *Anderson* v. *Rich- ardson*, 92 California, 623; *Land Co.* v. *Saunders*, 103 U. S. 316, 322, and other cases cited *supra*.

It is not a material circumstance that the government con- tractor and deputy surveyor to whom the government confided the subdivision of this township may have fraudulently neg- lected to perform his duty. *Murphy* v. *Kirwan*, 103 Fed. Rep. 104, 107, reversed in this court but on other grounds, 189 U. S. 35.

The absence of survey expressly appeared in *Simm's Lessee* v. *Baker*, Cooke (Tenn.), 146, and in *Singleton* v. *Whiteside*, 5 Yerg. at p. 36, and in *Whiteside* v. *Singleton*, Meigs (Tenn.), 207, 218. And see also *Fowler* v. *Nixon*, 7 Heisk. 719, 724; *Sturgeon* v. *Floyd*, 3 Rich. 80; *Stafford* v. *Quig*, 30 Texas, 257; *Phillipps* v. *Ayers*, 45 Texas, 605; *Jones* v. *Burget*, 46 Texas, 292.

The meander line cannot be used as a boundary line to cut

off plaintiff's lots. *Bruce* v. *Taylor*, 2 J. J. Marshall, 160. Monuments are superior to meander lines. *Shurmeier* v. *St. Paul R. R. Co.*, 10 Minnesota, 59; *St. Paul R. R. Co.* v. *Schurmeier*, 7 Wall. 272, 286; *Hardin* v. *Jordan*, 140 U. S. 371; *Middleton* v. *Pritchard*, 3 Scam. 510; *Mitchell* v. *Smale*, 140 U. S. 406; *Sizior* v. *Logansport*, 151 Indiana, 626; *Boorman* v. *Sunnucks*, 42 Wisconsin, 233; *Everson* v. *City of Waseca*, 44 Minnesota, 247; *Lamprey* v. *State*, 52 Minnesota, 181; *Forsyth* v. *Smale*, Fed. Cas. 4950; *Schlosser* v. *Cruikshank*, 96 Iowa, 424; *S. C.*, 65 N. W. Rep. 344; *Menasha Co.* v. *Lawson*, 70 Wisconsin, 600; *Coburn* v. *San Mateo County*, 75 Fed. Rep. 520.

The question in this case is identical with that involved in the case of *Murphy* v. *Kirwin*, which involved the title to other portions of this same belt of land lying between Cedar Island Lake and its meander line. See 83 Fed. Rep. 275; 103 Fed. Rep. 104; 109 Fed. Rep. 354, and analogous to *Nicolin* v. *Schneiderhan*, 37 Minnesota, 63, and *Olson* v. *Thorndike*, 76 Minnesota, 399.

Natural monuments when embraced in the calls of surveys of patents have absolute control and both course and distance must yield to their influence. *Brown* v. *Huger*, 21 How. 305, 318; *Preston's Heirs* v. *Bowmar*, 6 Wheat. 581; Tyler on Boundaries, 30; *Menasha Wooden Ware Co.* v. *Lawson*, 36 N. W. Rep. (Wis.) 412; *Wright* v. *Day*, 33 Wisconsin, 263; *Sphrang* v. *Moore*, 22 N. E. Rep. (Ind.) 319; *Palmer* v. *Dodd*, 31 N. W. Rep. (Mich.) 209.

Meander lines have no significance as boundary lines and are only intended to afford a means of computing the number of acres the government requires payment for, nor is the grantee limited to the number of acres specified in the patent. *St. Clair* v. *Lovingston*, 23 Wall. 46, 62; *Fuller* v. *Dauphin*, 124 Illinois, 542; *Clute* v. *Michigan*, 65 Michigan, 48; *Chan* v. *Brandt*, 45 Minnesota, 93; *St. Paul &c. R. R. Co.* v. *St. Paul &c. R. R. Co.*, 26 Minnesota, 31; *Ladd* v. *Osborn*, 79 Iowa, 93; *Heald* v. *Yumisko*, 7 N. D. 427; *Jones* v. *Pettibone*, 2 Wisconsin, 308, 320; *Lodge's Lessee* v. *Lee*, 6 Cranch, 237; *French* v. *Ban-*

*head,* 11 Gratt. 136, 157; *Lynch* v. *Allen,* 4 Dev. Bat. 62; *Kelley* v. *Graham,* 9 Watts, 116.

Cases cited by defendant in error can be distinguished from this case.

As involving the construction of a Federal survey the case is reviewable by this court. *French-Glenn Co.* v. *Springer,* 185 U. S. 47, 54; *Cousin* v. *Labatut,* 19 How. 202; *Maguire* v. *Tyler,* 1 Black, 195, 203; *Railroad Co.* v. *Schurmeier,* 7 Wall. 272; *Kennedy's Exrs.* v. *Hunt's Lessee,* 7 How. 586, 594; *Packer* v. *Bird,* 137 U. S. 661; *Knight* v. *Land Assn.,* 142 U. S. 161; *Shively* v. *Bowlby,* 152 U. S. 1; *Glasgow* v. *Baker,* 128 U. S. 57.

*Mr. John R. Van Derlip* and *Mr. R. R. Briggs,* with whom *Mr. George P. Wilson* was on the brief, for defendants in error.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

The land in controversy in this case is described in the foregoing statement of facts, and it lies between the meander line as it appears on the plat of the survey referred to in the patents and the actual borders of the lake. (See the sketch of the plat at page 43 of volume 189, United States Reports.) Regarding the question of the boundaries, counsel for plaintiff in error assert in their brief that if distance is to prevail, then the land in controversy is an unsurveyed strip lying between the lots of the plaintiff in error and the lake; while if the natural monument is to prevail, then the strip of land in controversy is part and parcel of the lots of the plaintiff in error. The boundaries of the lots as shown upon the plat of survey giving the so-called meander line of the lake, described in the field notes, are unquestionably correct, so far as the three sides of the fractional lots are concerned, and the only difference is as to the side which purports to front on the lake. In regard to this fourth side, the plaintiff in error, as a remote grantee from the patentees, bases its claim to the land lying between the

meander line and the lake, upon the grounds that the patents conveying the lots to the patentees contained the clause: "According to the official plat of the survey of the said lands returned to the General Land Office by the surveyor general;" that the plat of the survey of the lands, by reason of such reference, became a part of the grant described in the patents; that the plat showed, as the fourth side of the land granted, a meander line around Cedar Island Lake; that the lake thereby became a natural monument or boundary, and that although the plat of the survey turns out to have been a mistake as to the position of the lake, and the line was, therefore, not in truth anything like an accurate meander line, yet by reason of that plat and of that line, which assumed to show the borders of a lake, the patentees had the right to claim that they bought in reliance upon and that they were entitled to a boundary upon a lake.

In support of these contentions the plaintiff in error cited *Cragin* v. *Powell,* 128 U. S. 691, and *Jefferis* v. *East Omaha Land Co.,* 134 U. S. 178, 194, as to the effect of a grant according to an official plat of a survey referred to in the grant, and the cases of *McIver's Lessee* v. *Walker* (1815), 9 Cranch, 173; *Newsom* v. *Pryor's Lessee* (1822), 7 Wheat. 7; *County of St. Clair* v. *Lovingston* (1874), 23 Wall. 46; *Land Company* v. *Saunders* (1880), 103 U. S. 316, and other cases, affirming the general rule that, in matters of boundaries, natural monuments or objects will control courses and distances.

These general rules may be admitted. The rule as to natural monuments is not, however, absolute and inexorable. It is founded upon the presumed intention of the parties, to be gathered from the language contained in the grant, and upon the assumption that the description by monuments approaches accuracy within some reasonable distance, and places the monument somewhere near where it really exists. *White* v. *Luning,* 93 U. S. 514; *Ainsa* v. *United States,* 161 U. S. 208, 229; *Baldwin* v. *Brown,* 16 N. Y. 359; *Buffalo &c. Railroad Company* v. *Stigeler,* 61 N. Y. 348; *Higinbotham* v. *Stoddard,* 72 N. Y. 94;

*Hall* v. *Eaton*, 139 Massachusetts, 217.   These cases illustrate, somewhat, the principle upon which the general rule is founded, and show how far it has, upon occasion, been regarded as inapplicable.   The patents mention the number of acres contained in each lot, and that number is stated in the eleventh finding of the trial judge, which is set forth in the foregoing statement of facts.   The difference between the number of acres stated in the patents to be in each lot and the number now claimed by the plaintiff in error is very large, and is subsequently referred to herein.   It seems plain that the intention was to convey no more than the number of acres actually surveyed and mentioned in the patents.   In *Ainsa* v. *United States* (*supra*), this is deemed to be a very important and sometimes a decisive fact.   It is true that many cases cited by the plaintiff in error have enforced the superiority of natural monuments over courses and distances where the difference in the amount of the land conveyed as between the two classes of description was also very great.   In the case at bar, while there is a great difference in the amount of land so described, there are at the same time ,other facts which are material and which in our opinion, when considered in connection with this difference, justify and demand a refusal to be controlled by the borders of the lake as a boundary.

It is well to see what the facts in this case were upon which the state court founded its decision.   They are set forth in detail in the foregoing statement of facts, but a few of the more important may be here referred to.

· There was, in truth, no such survey as was called for by the contract between the government and the surveyor.   The exterior lines, with the exception of the south line of the township, were run, but no survey of the interior of the township was ever made and no section lines thereof were ever run, with one possible exception, and in truth the survey as a whole was a fraud. · No such body of water at the place indicated on the plat of survey then existed or now exists.   On the contrary, the lake is from half a mile to a mile away from what is called

its meander line on the plat of the survey filed by the surveyor. It covers only about twenty acres in the southeast corner of section 4. The surveyor never was on the ground and never saw the lake he pretended to measure, and the lake never existed where he laid it down in his fraudulent survey. If the side lines of the various lots were projected in their course, those of lot 3 would never reach the lake, and those of lots 5 and 6 would not reach the lake within the limits of section 4, while the south line of lot 7 would touch the lake, and a few feet of frontage would then be secured, and that lot would then have 139 instead of 25.25 acres. The side lines of lots 5, 6 and 7, if protracted, would instantly cross the protracted side lines of lot 3. There are at least 1,000 acres of high, tillable land between the actual water line of the lake and the meander line as returned by the field notes and the plat of survey, and the land is covered by trees of more than a century's growth and growing down to the water's edge. In order to bound on the lake the lots would exhibit a totally different form from that which they take on the plat of survey and such boundary would violate every rule of statutory survey, by conveying lands not conforming to the system adopted by the government and carried out ever since its adoption.

The patentees, it must also be borne in mind, get all the land they really purchased and paid for, as laid down by the lines and distances set forth in the survey and as stated in the patents. These lines and distances (of lots 3, 5, 6 and 7) gave the patentees 140.87 acres of land, and that was the amount they paid for, while if the fourth line of the boundary of the lots were taken out and others substituted in the way shown by the dotted lines in the plat in 189 U. S. *supra*, and so as to reach the borders of the lake as it then actually existed and now exists, they would get 571 acres, or fourfold more land than was actually mentioned and described in the patents conveying these four lots, or than they supposed they were purchasing, or than they actually paid for.

Upon these facts the question recurs whether the patentees

by reason of the general rules above mentioned took these lands which they now claim, although they never in reality bought or paid for them. We think they did not; that the rules have no application to a case like this, and that plaintiff in error must be confined to the lots which are correctly described within the lines and distances of the plat of survey and of the field notes and which the patentees actually bought and paid for.

The fraudulent character of the survey, the non-existence of the lake within at least half a mile of the point indicated on the plat, the excessive amount of land claimed as compared with that which was described and stated in the patents and actually purchased and paid for, the difficulty in reaching the lake at all, and the necessity in order to do it of going outside of section 4, (with the exception as to a small part of lot 7,) the section in which the description and plat placed all the land, all go to show that the lake ought not to be regarded as a natural monument within the cases, or within the principle upon which the rule is founded, and therefore the courses and distances by which the amount of land actually purchased and · paid for was determined, ought to prevail.

The non-existence of a lake anywhere near the spot indicated on the plat is a strong reason for regarding the so-called meander line as one of boundary instead of a true meander line, and when the plat itself is the result of a gross fraud, and indeed is entirely founded upon it, the reason for refusing to recognize the lake as a boundary becomes apparent.

The land actually purchased and paid for was conveyed and covered by the description by courses and distances set forth in the field notes and referred to in the patents, and the government is concluded as to such land, but the implication of a boundary by the lake as delineated on the plat of survey, which might otherwise be made, will not be permitted when it is based upon such facts as have been already adverted to in this case. Giving the patentees all the land in acres, stated in the patents and described and contained in lines and dis-

tances in such patents, and which is all they paid for, protects them, and the government ought not to be further concluded by the fraudulent acts of a public officer.

As is said in the trial court in this case, there must be some limit to the length courts will go in search of the water delineated on a plat of survey, with a meander line shown thereon. If the water were ten miles away, it is certain that a claim to be bounded thereon would not for one moment be admitted. A distance of half a mile, enough to plainly show the gross error of the survey, together with the other facts adverted to herein, are sufficient to justify a refusal to apply the general rule that a meander line is not usually one of boundary.

Nor in such case is it necessary to go into equity to reform the patent. Where the patentee has in fact received and is in possession of all the land actually described in the lines and distances, and is seeking for more on the theory that his plat of survey carries him to the water, a denial of that claim upon such facts as appear here is well founded, and requires no reformation of the patent. It is simply a question of boundary, and it is a legal defence, it is but a denial that the land claimed is in fact included in the patent as it exists, and no aid of a court of equity is necessary to sustain such a defence.

We think *French-Glenn Live Stock Company* v. *Springer,* 185 U. S. 47, is authority which calls for the affirmance of this judgment. In that case the plaintiff claimed under patents from the United States, which referred to the official plats of the survey, and by which it appeared the township was rendered fractional by abutting upon the meander line along the south side of Malheur Lake, which plat appeared to have been approved by the Land Department of the government, and the plat showed the lots as bounded "north by the meander line of Malheur Lake." The field notes of the survey of the exterior boundaries of the township and its subdivisions and the meander line of Malheur Lake itself, under the title heading "Meanderings of the south shore of Malheur Lake through fractional township 26," etc., indicated that it was run "with

the meander of the lake." The plaintiff in that case claimed title to land which was just north of this meander line on the ground. that such land was a portion of the lake when the survey was made and the meander line run around it; that the water had since receded because of certain facts stated, and that plaintiff was entitled to the land thus uncovered, as an accretion by way of reliction to his adjoining land. The defendant disputed this claim, and asserted that when the survey was made and the plat thereof, with its meander line, was referred to in the patent, there was in fact no such lake anywhere near that spot, and the so-called meander line was in truth a line bounding plaintiff's land and limiting him thereby so that he could not go beyond it in order to find the lake which plaintiff claimed as a boundary. This court held that the line, which appeared on the plat as a meander line of the lake, was in truth a line of boundary beyond which the plaintiff could not go in search for the lake. The question of fact as to which of the two contentions was right, the receding of the water or the non-existence of the lake at the time of the survey, was submitted to the jury, and that body found in favor of the defendant's theory. The result of the decision was to refuse to consider the lake as a natural monument, because it did not exist at any point near where it was placed on the plat. What purported on the plat to be a meander line was held not to be one, but on the contrary it was held to be a boundary of the land of the plaintiff, beyond which he could not go. After speaking of the question of fact and its decision by the jury in favor of the defendant, Mr. Justice Shiras, in giving the opinion of the court, said:

"The land in dispute, in the possession of the defendant in error, was not included within the lines of the original survey, nor in the description of the lots contained in the patents and in the deeds of conveyance under which the plaintiff in error holds, and to add the land in controversy to the lots so de- scribed would more than double the area of the land claimed by the plaintiff in error; but the contention of the plaintiff in

error was, in the courts below and now is, in this court, that, as the plaintiff in error bought in reliance upon the plats and patents which showed the meander line of the lake, such plats and patents must be deemed to conclusively establish that the lake was the northern boundary of the land, so far as the rights of riparian grantees are concerned. . . .

"While it may be conceded that the description of the lots contained in the survey, plats and patents are conclusive as against the government and holders of homesteads, so far as the lands actually described and granted are concerned, such conclusive presumption cannot be held to extend to lands not included within the lines of the survey, and which are only claimed because of the alleged existence of a lake or body of water bounding said lots, whose recession has left bare land accruing to the owners of the abutting lots. We agree with the Supreme Court of Oregon in thinking that the question whether the northern boundary of the lots of the plaintiff in error was an existing lake, the recession of whose waters would leave the bed of the lake, thus laid bare, to accrue to the owner of the lots, was a question of fact which was not concluded by a mere call for a meander line. If, indeed, there had been a lake in front of these lots at the time of the survey, which lake had subsequently receded from the platted meander lines, the claim of the owner of the lots to the increment thus occasioned might be conceded to be good, if such were the law of the State in which the lands were situated. But if there never was such a lake—no water forming an actual and visible boundary—on the north end of the lots, it would seem unreasonable, either to prolong the side lines of the survey indefinitely until the lake should be found, or to change the situs of the lots laterally in order to adapt it to a neighboring lake. The jury having found that the facts under this issue were as claimed by the defendant in error, the conclusion must be that the rights of the plaintiff in error must be regarded as existing within the actual lines and distances laid down in the survey and to the extent of the acreage called for in the patents, and

that the meander line was intended to be the boundary line of the fractional section."

In the above cited case the important point to be considered is that the court refused to be bound by the appearance on the plat of survey showing a meander line of the lake when the fact was found by the jury (and exists in this case) that at the time of the survey there was no such lake existing at any point near where it appeared to be on the plat, and that under those circumstances a meander line appearing on the plat would be and was regarded as a line of boundary to the exclusion of what was claimed to be a natural object, namely, the lake itself.

It is not important that the plaintiff's claim was founded upon the allegation that the land there in question was the result of a subsidence of the water of the lake, and that he was, therefore, entitled to such land by reason of accretion. The point lies in the fact that what appeared as a meander line on the plat, was treated as a boundary line and the lake was held not to be such boundary, for the reasons stated in the opinion. Those reasons exist in full force in this case, only here the disparity between the amount of land conveyed and paid for and the amount now claimed is double that stated in the case cited. Mr. Justice Shiras in the course of his opinion, refers to other cases in this court as authority for the proposition that a meander line may be in some cases a line of boundary limiting the land conveyed or described by the line itself, and not by any body of water. See *Niles* v. *Cedar Point Club*, 175 U. S. 300, 308; *Horne* v. *Smith*, 159 U. S. 40. Upon this subject it was well said by the State Supreme Court in this case as follows:

"The official plat was only intended to be a picture of the actual conditions on the ground; but the fraudulent mistake in the plat in this case was so gross that no man actually viewing the premises could possibly be misled, or believe that the shore line of the lake was intended as the boundary line of the lots. He would understand at once that the meander line

as traced on the plat was the actual boundary line of the lots.

"This case, then, is one where the call for the natural monument, the lake, must be disregarded; for the admitted facts show that it is an impossible call, and that, if it is rejected, the courses and distances and the meander line will exactly close, and give to the plaintiff the precise quantity of land bought from the government and paid for. It falls within the rule that a meander line is not, as a general proposition, a boundary line; yet the boundaries of fractional lots will not be indefinitely extended where they appear by the government plat to abut on a body of water which in fact has never existed at substantially the place indicated on the plat. In such exceptional cases, the supposed meander line will, if consistent with the other calls and distances indicated on the plat, mark the limits of the survey, and be held to be the boundary line of the land it delimits."

That this was a fraudulent survey cannot be denied. Still, the government is concluded by such survey, so far as the lands actually described, granted and paid for are concerned, but it will not be concluded in regard to other lands, which were not within the lines of the survey, and which are only claimed because of the alleged existence of a lake or body of water bounding said lots, when such lake or body of water is in fact and always has been more than half a mile away from such lots, and where the patentee has received all the land that he actually paid for.

It appears from the various reports of the case of *Kirwan* v. *Murphy*, cited by plaintiff in error, that the government was intending to make a survey of that portion of this township lying between the alleged meander line and the actual lake, as unsurveyed land, when certain grantees of patentees of lots, which by the plat of survey bounded on the lake, commenced proceedings to obtain an injunction to prevent what was alleged would be a resurvey. The case is first reported in 83 Fed. Rep. 275, where the opinion of the Circuit Court of Ap-

peals is given upon affirming the order granting the injunction. The case was then tried, and the decision of the United States Circuit Court in Minnesota, upon such trial, directing judgment for the plaintiffs, is reported in 103 Fed. Rep. 104, and upon appeal the decision of the United States Circuit Court of Appeals for the Eighth Circuit, affirming the judgment, is reported in 109 Fed. Rep. 354. Those courts were of opinion that the Land Department had no right to make the proposed survey, and that the fractional lots went to the lake, and the government could not revoke its grant and correct the survey so far as regarded the patentees, or their grantees, in good faith. Upon writ of error from this court the judgment was reversed for the reason that the remedy by injunction was not proper, and also because the Land Department was vested with the administration of the public lands and could not be divested by the fraudulent action of a subordinate officer outside of his authority, and in violation of the statute. The exact point involved here was not presented in that case, and this court held that it could not be passed upon in that proceeding. 189 U. S. 35.

For the reasons we have stated, we cannot concur in the conclusions of the lower Federal courts, that the patentees had the right to bound their lots by the lake as it actually existed. The judgment is

*Affirmed.*