JEEMS BAYOU HUNTING & FISHING CLUB et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. June 10, 1921.)

No. 3522.

1. **Public lands ⬦⇒26—Natural monument does not govern, where there is fraud or gross error in survey.**

   The rule that where a patent to public land refers to a plat, which shows that the land is bounded by a lake or other body of water, the surveyed line along what the plat indicates as the border of such water is treated as a meander line, and the water and not the line forms the boundary of the tract, does not apply where, through the fraud or gross mistake of the surveyor, the line is manifestly not the water line.

2. **Public lands ⬦⇒28—Land erroneously omitted from survey as under water may be resurveyed.**

   Where a portion of the public lands was erroneously omitted from a survey thereof as being under water, either because of a mistake or fraud of the surveyor, when in fact it was dry land, the Land Department, upon discovering the error, has power to cause the omitted land to be surveyed and to dispose of it.

3. **Public lands ⬦⇒26—Large body of land between meander line and shore held not included in patent.**

   Where the line in a patent to public land, which was shown by a plat to be the shore of a lake, was in fact a half mile from the shore at its nearest point, and there was a large body of high land between the line and the shore, it is obvious the line was not the meander line of the shore, as shown by the plat, and the patent did not convey title to the shore of the lake, but only to the line described, especially where that line included more than twice the quantity of land paid for.

4. **Mines and minerals ⬦⇒7—Oil lessees held not willful trespassers on land omitted from survey.**

   Where the lessor had been in possession of land for a long time, claiming it under a patent issued to a remote grantor, though the land in controversy was outside of the line of the patent shown on the plat as the meander line of a lake, and no claim to the land was made by the government until after lessees had struck oil thereon and were removing the oil therefrom, lessees are not willful trespassers on the public lands, and are entitled, on an accounting for the oil taken, to credit for the expense of producing it.

Appeal and Cross-Appeal from the District Court of the United States for the Western District of Louisiana; Rufus E. Foster, Judge.

Bill in equity by the United States against the Jeems Bayou Hunting & Fishing Club and others, to have the United States adjudicated to be the owner of a certain tract of land, and to compel defendants to account for oil and gas removed therefrom. There was a decree that the United States was entitled to the land in controversy, and that defendants should pay the full value of oil removed therefrom, less

⬦⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the expense of removal, and defendants appeal, and the United States files cross-appeal from so much of the decree as allowed defendants credit for expenses of removal of the oil. Decree affirmed.

N. C. Blanchard, of Shreveport, La. (Hampden Story, H. C. Walker, Jr., and Elias Goldstein, all of Shreveport, La., on the brief), for appellants and cross-appellees.

Robert A. Hunter, Sp. Asst. Atty. Gen., of Shreveport, La., for the United States.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. By the bill in equity in this case the United States, claiming to be the owner of land now known and described as lots 8, 9, and 10, in township 20 north, of range 16 west, situated in the parish of Caddo, La., containing 85.22 acres, as shown by a plat of survey approved March 28, 1917, by the Commissioner of the General Land Office, sought relief which included the following: An adjudication that the above-described land is the property of the plaintiff, free and clear of all claims of the defendants to the suit, and that the possession of said land be restored to the plaintiff; that the defendants be enjoined from setting up any claim to said land, or to any oil, gas, or other minerals on or under the same; an accounting by the defendants for oil and gas removed or extracted from said land, and for all moneys derived from the sale or disposition of the same, and for all rents, royalties, and proceeds arising from the sale or lease of the same; and for the recovery from the defendants of all such sums so received by them. The defendants were three corporations, namely, the Jeems Bayou Fishing & Hunting Club, the Producers' Oil Company, and the Texas Company.

The bill contained averments to the effect that the Producers' Oil Company, acting under a pretended lease made to it by the Jeems Bayou Fishing & Hunting Club, wrongfully entered upon said land and took therefrom a large quantity of oil and gas, which it sold to the Texas Company, and that it paid as a royalty part of the value of such oil and gas to the Jeems Bayou Fishing & Hunting Club. The plaintiff's assertion of right to the relief sought was resisted on the ground that title to said land was acquired by Stephen D. Pitts by a patent issued to him on October 1, 1860, for the "southwest fractional quarter of section 10, in township 20, of range 16 west, in the district of lands subject to sale at Natchitoches, La., containing 23 acres, according to the official plat of the survey of the said lands, returned to the General Land Office by the Surveyor General," and that that title thereafter was duly acquired by the Jeems Bayou Fishing & Hunting Club, which leased said land to the Producers' Oil Company.

By the court's decree the first above-mentioned land was adjudged to be the property of the plaintiff; the Producers' Oil Company and the Texas Company were adjudged in solido to pay to the plaintiff the ascertained value of oil taken from said land, less the ascertained cost of producing it, and less the amount paid as royalty to the Jeems Bayou Fishing & Hunting Club; the three defendants were adjudged

in solido to pay the ascertained amount paid as royalty to the Jeems Bayou Fishing & Hunting Club; and interest from the date of the Master's report, which was confirmed, was allowed on the amounts adjudged to be paid to the plaintiff. The defendants appealed from the decree, and complain of it so far as it was adverse to them. The plaintiff sued out a cross-appeal, and complains of the part of the decree which credited the defendants, or any of them, with the amount of the cost of producing oil from the land. The respective parties are referred to herein as plaintiff and defendants.

The official plat of survey which was referred to in the above-mentioned patent issued to Stephen D. Pitts was one of the township mentioned made in 1839 by A. W. Warren, deputy surveyor, which was filed in the General Land Office after being approved in writing on August 31, 1839, by H. T. Williams, Surveyor General. A large part of the space included within the exterior lines of said township 20 is covered by a body of water which was designated on the Warren plat as "Ferry Lake." According to that plat the only land in the southwest part of section 10 of that township is a narrow peninsula, bounded on most of its eastern side and on all of its southeastern, southern, southwestern, and western sides by Ferry Lake; the plat also showing that the shore line of the land in the township north of the southwest fractional quarter of section 10 is an irregular one, running generally a little west of north from the point at which the east and west line running through the center of section 10 ends at at the lake shore a short distance west of the center of that section. That plat does not indicate even approximately the actual location of Ferry Lake with reference to the land included within the traverse line, being the broken line of different courses and distances, shown by Warren's survey to have been run by him around the land designated on his survey and plat as the southwest fractional quarter of section 10.

Evidence adduced proved that there is a compact body of high land, comprising 528.99 acres, lying between the actual shore line of Ferry Lake and the line which Warren's plat indicates is the shore line of lands in sections 10 and 3; that omitted land being south, southwest, and west of Warren's traverse line extending northwardly from its southernmost point in fractional southwest quarter of section 10 to the northern boundary of the township. Southeast, south, and southwest of the land included within the traverse line run by Warren around the tract in the southwest fractional quarter of section 10 surveyed by him is a considerable body of high land, part of which by a proper survey would have been included in that fractional subdivision, and the remainder of which lies south of the line between sections 10 and 15, which line, in consequence of Warren's error as to the location of the margin of Ferry Lake, was not run by him at all. The average distance in a westerly direction of Ferry Lake, or James or Jeems Bayou, as that part of the body of water in the township is now called, from Warren's traverse line along the western side of the above-mentioned peninsular-shaped tract surveyed by him is considerably more than 2,500 feet; the distance from a number of points on that line being over 3,000 feet.

Portions of the above-mentioned lands, which were omitted from the survey made by Warren, were surveyed prior to 1913 under orders of the Commissioner of the General Land Office. In September, 1913, that official directed Arthur D. Kidder, supervisor of surveys, to make a resurvey of the township for the purpose of determining whether Ferry Lake was a navigable body of water in 1812, when Louisiana was admitted as a state, and whether Warren's survey correctly meandered the lake as it existed at the time of Louisiana's admission. That resurvey was completed in May, 1914, and the result was shown by hydrographic and topographic plats and by a resurvey map, accompanied by field notes, all of which were approved by the Commissioner of the General Land Office. The resurvey plat mentioned showed land, including that involved in this suit, lying between Warren's traverse lines and the mean high-water mark of Ferry Lake as it existed in 1812 and 1839. On December 1, 1916, the Commissioner of the General Land Office ordered Mr. Kidder to survey the uplands which the above-mentioned resurvey disclosed as existing between Warren's traverse lines and the mean high-water line of the lake. The survey was made as ordered, and is represented by an official plat approved by the Commissioner of the General Land Office on March 28, 1917.

The last-mentioned survey included the lands involved in this suit; the three subdivisions, called in that survey lots 8, 9, and 10 of section 10, township 20, etc. (those three lots containing in the aggregate 85.-22 acres), being most of the land in the southwest portion of that section which was omitted from the Warren survey. Warren's survey and plat do not show any land in section 9, which adjoins section 10 on the west, in section 15, which adjoins section 10 on the south, or in section 16, which adjoins section 9 on the south. That plat makes no mention of sections or fractional sections numbered 9, 15, and 16. So far as is disclosed, Warren ran no line which is a boundary of any of the three last-mentioned sections. Evidence adduced abundantly supported findings that the lands in section 10, outside of the lines run therein by Warren, and the lands in sections 9, 15, and 16, which were disclosed and described by the Kidder survey and plat, were high lands in place, and above the mean high-water level of Ferry Lake, in 1812 and 1839. By the lines and distances set forth in Warren's survey there are 48 acres in the subdivision granted by the above-mentioned patent to Pitts, being more than twice as much land as that instrument show the patentee paid for.

[1] The defendants, in support of their claim to the land in question and to oil taken therefrom, invoke the rule that where a patent granting public land refers to a plat for identification of the land granted, and the plat so referred to shows that such land is bounded by a lake or other body of water, the surveyed line along what the plat indicates is the border of such water is treated as a meander line, with the result that the water, and not such meander line, is the boundary of the land granted. Warren's survey and plat on their face indicate that the traverse line run by him around the peninsular-shaped tract in the southwest quarter of section 10 was a meander

line of the border of Ferry Lake. Evidence other than that furnished by such survey and plat demonstrated that that part of the traverse line mentioned which ran along the southeastern, southern, southwestern, and western sides of the peninsular-shaped tract was run without any regard whatsoever to the location of that tract with reference to Ferry Lake. Warren's plat was wholly false as a representation or indication of a state of fact, in so far as it was capable of being used as a basis for an inference that the just-mentioned part of his traverse line around the peninsular-shaped tract was a meander line run along or near the margin of Ferry Lake.

The opinion in the case of Mitchell v. Smale, 140 U. S. 407, 11 Sup. Ct. 819, 35 L. Ed. 442, after stating the rule invoked and applying it, with the result of recognizing that a patentee of a subdivision of land which a plat referred to in the patent showed was bounded by a lake was entitled to a tongue of land extending out into the lake beyond the surveyed line, which the plat indicated was a meander line of the margin of the lake, contained the following statement:

"We do not mean to say that, in running a pretended meander line, the surveyor may not make a plain and obvious mistake, or be guilty of a palpable fraud, in which case the government would have the right to recall the survey, and have it corrected by the courts, or in some other way. Cases have happened in which, by mistake, the meander line described by a surveyor in the field notes of his survey did not approach the water line intended to be portrayed. Such mistakes, of course, do not bind the government."

[2] It is well settled that where public land was improperly omitted from a survey in consequence of the surveyor, influenced by such a mistake or fraud, treating as under water what at the time of his survey actually was high land within the limits of the area which was the subject of his survey, the Land Department, upon discovering the error, has power to deal with the land so improperly omitted, to cause it to be surveyed, and lawfully to dispose of it. Lee Wilson & Co. v. United States, 245 U. S. 24, 38 Sup. Ct. 21, 62 L. Ed. 128. The existence and exercise of such power are not inconsistent with the rights of one who acquired a subdivision of land included in such survey under a patent containing a reference to the surveyor's plat, which falsely indicated that the land patented, along the whole or part of the line surveyed around it, bordered on a body of water, when in fact that line was remote from any body of water.

[3] The well-established fact that when Warren's survey was made there was, as there is now, between the western surveyed line of the peninsular-shaped tract and the margin of Ferry Lake, a strip of high land nearly half a mile wide in its narrowest part, requires the conclusion that the making and return of that part of Warren's plat which had the effect of representing that that western line disclosed the location on that side of the tract of the margin of Ferry Lake was due to either gross error or fraud on the part of the surveyor. A result of the omission from the survey of the large compact body of land containing over 500 acres, of which the just-mentioned strip is a part, was that there was, as to a material part of the land in the township, a failure to comply with requirements of law governing the

survey ordered to be made, in that section lines were not run and section corners were not established and marked in the omitted area, and none of the land therein was surveyed or assigned to its appropriate subdivision. R. S. §§ 2395, 2396 (Comp. St. §§ 4803, 4804); Brown's Lessee v. Clements, 3 How. 650, 11 L. Ed. 767.

Controlling authorities fully support the propositions that, on the state of facts disclosed by the evidence in this case, the above-mentioned patent to Pitts confers on those claiming under it no right or title to land not included in the surveyed lines and distances of the subdivision patented, which in fact contained more than twice the number of acres stated in the patent, and that there is no merit in their claim to land outside such surveyed lines, based upon the false representation of the plat referred to that the land patented bordered on Ferry Lake. Security Land & Exploration Co. v. Burns, 193 U. S. 167, 24 Sup. Ct. 425, 48 L. Ed. 662; Id., 87 Minn. 97, 91 N. W. 304, 63 L. R. A. 157, 94 Am. St. Rep. 684; French Glenn Live Stock Co. v. Springer, 185 U. S. 47, 22 Sup. Ct. 563, 46 L. Ed. 800; Horn v. Smith, 159 U. S. 40, 15 Sup. Ct. 988, 40 L. Ed. 68. The following was said in the opinion of the Supreme Court of the United States in the first-cited case on the subject of a surveyed line being a boundary, though a plat referred to indicated that it was run along or near the margin of a body of water; part of the statement being a quotation from the opinion of the Supreme Court of Minnesota in the same case:

"Upon this subject it was well said by the state Supreme Court in this case as follows: 'The official plat was only intended to be a picture of the actual conditions on the ground; but the fraudulent mistake in the plat in this case was so gross that no man actually viewing the premises could possibly be misled, or believe that the shore line of the lake was intended as the boundary line of the lots. He would understand at once that the meander line as traced on the plat was the actual boundary line of the lots. This case, then, is one where the call for the natural monument, the lake, must be disregarded; for the admitted facts show that it is an impossible call. * * * It falls within the rule that a meander line is not, as a general proposition, a boundary line; yet the boundaries of fractional lots will not be indefinitely extended where they appear by the government plat to abut on a body of water which in fact has never existed at substantially the place indicated on the plat. In such exceptional cases, the supposed meander line will, if consistent with the other calls and distances indicated on the plat, mark the limits of the survey, and be held to be the boundary line of the land it delimits.' That this was a fraudulent survey cannot be denied. Still the government is concluded by such survey, so far as the lands actually described, granted and paid for are concerned, but it will not be concluded in regard to other lands, which were not within the lines of the survey, and which are only claimed because of the alleged existence of a lake or body of water bounding said lots, when such lake or body of water is in fact and always has been more than half a mile away from such lots, and where the patentee has received all the land that he actually paid for."

[4] We do not think that under the circumstances disclosed the defendants are liable as willful trespassers for the taking of oil from the land in question. It was in 1910 that one of the defendants, the Jeems Bayou Fishing & Hunting Club, made the lease to another defendant, the Producers' Oil Company, of land described as the fractional southwest quarter of section 10, etc., for the purpose of drilling wells and exploring for oil, gas, etc. At the time that lease was made,

and for many years prior to that time, the land now in question had been treated as having been acquired by Pitts under the patent issued to him. During that time there was no assertion by the government of a claim that that land remained a part of the public domain. It was not disclosed that when the lease was made, or when the lessee drilled wells on the land and took oil therefrom, either the lessor or the lessee realized that the land in question belonged to the United States. It was not made to appear that, when those things were done, either the lessor or the lessee was aware of the state of facts having the effect of making the surveyed line around the above-mentioned peninsular-shaped tract the boundary of the subdivision granted by the patent which was the source of their title.

If the original survey of the township had been made in pursuance of the requirements of law, both the land in question and that within the lines run by Warren around the peninsular-shaped tract would have been included in a subdivision properly called the fractional southwest quarter of section 10, etc. It was after the lessee had drilled oil-producing wells on the land in question that the exhaustive investigation was made at the instance of the Commissioner of the General Land Office, which resulted in disclosing the existence of such a state of facts at the time Warren made his survey as required the conclusion that his surveyed line around the above-mentioned peninsular-shaped tract shown on his plat was the boundary of the subdivision patented to Pitts. The evidence adduced was consistent with the conclusions that the drilling of wells on the land in question and the taking oil therefrom were unaccompanied by any intention on the part of the defendants, or either of them, to violate any law or to do any wrongful act, and that the defendants acted under a mistake of fact as to the location of the boundary of the land described in the lease, and without knowledge of the facts which require the conclusion that title to the land in question has not passed out of the United States. On the facts disclosed the court properly ruled that the measure of liability for the oil taken from the land in question was the value of that oil, less the cost of producing it. United States v. St. Anthony R. Co., 192 U. S. 524, 24 Sup. Ct. 333, 48 L. Ed. 548.

The decree under review is affirmed.