## MATTER OF COLETTI

### In Deportation Proceedings

### A-13241835

### *Decided by Board April 11, 1966*

Where respondent was married in Italy by religious ceremony in 1962, a child was born of this union, and respondent lived with his wife in a husband-wife relationship until his entry into the United States on July 6, 1963, with a preference immigrant visa obtained under the then existing provisions of section 203(a)(3), Immigration and Nationality Act, as the unmarried son of a U. S. resident alien, he was not entitled to such status as he was not "unmarried" within the meaning of the immigration laws even though at the time of entry his religious marriage lacked formal perfection, it having no civil effect until recorded on October 28, 1963, upon his return visit to Italy.

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry—Not of proper status under quota—Section 211(a)(4) [8 U.S.C. 1181(a)(4)].

Lodged: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry—Immigrant, no valid entry document—Section 212(a)(20) [8 U.S.C. 1182(a)(20)].

The case comes forward on appeal by the trial attorney from a decision of the special inquiry officer dated December 8, 1965 ordering that the proceedings be terminated.

The record relates to a native and citizen of Italy, male, who was issued by the United States Consulate in Genoa, Italy on April 2, 1963 a preference immigrant visa under the then existing provisions of section 203(a)(3) of the Immigration and Nationality Act as the unmarried son of a United States resident alien. He was admitted to the United States on July 6, 1963 upon presentation of this visa. On October 12, 1963 the respondent departed from the United States and reentered on November 3, 1963, presenting his alien registration receipt card issued to him as an alien previously lawfully admitted to the United States for permanent residence. It has been established

that the respondent was married under the rites of the Catholic Church by a religious ceremony on December 27, 1962 to Anna Maria Salamon at Belluno, Italy. This religious marriage preceded the first admission of the respondent to the United States on July 6, 1963. Upon his return to Italy the respondent's religious marriage was civilly recorded on October 28, 1963 and he has now petitioned for preference immigration classification for his wife to come to the United States.

Section 203(a)(3) of the Immigration and Nationality Act provides for the issuance of preference quota immigrant visas to aliens who are the unmarried sons of aliens lawfully admitted for permanent residence. Section 101(a)(39) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(39)) defines the term "unmarried," when used in reference to any individual as of any time, to mean an individual who at such time is not married, whether or not previously married. The issue in the case is whether the respondent is to be considered as "unmarried" at the time he entered the United States as the "unmarried" son of a lawfully resident alien as required by the terms of his section 203(a)(3) visa.

There have been introduced into the record the Concordat of 1929 between the Italian Government and Holy See, copies of the Italian marriage laws and the testimony of Dr. Enrico L. Pavia, an expert on Italian law. Article 5 of Italian Law No. 847 of May 27, 1929, "Provisions for application of the part concerning marriage in the Concordat of February 11, 1929 between the Holy See and Italy" (Ex. 8) provides as follows:

A marriage performed by a minister of the Catholic religion in accordance with the rules of canon law shall, from the day on which it is celebrated, produce the same effects as a civil marriage when it has been recorded in the registers of vital statistics in accordance with the provisions of arts. 9 et seq.

The expert witness testified that it is the recording which makes the marriage exist for civil law; and that the reporting is not merely a ministerial act but that the transcription has a constitutive effect. Based upon the totality of the extensive exhibits and from the testimony of the expert witness, the special inquiry officer has been unable to find anything to contradict the opinion of the expert witness to the effect that the respondent was unmarried under Italian law when he first entered the United States. Conceding that it might well be that the congressional intent with reference to the term "unmarried son" of a lawfully resident alien as contained in section 203(a)(3) of the Immigration and Nationality Act was being circumvented in the instant case, the special inquiry officer felt he was not free to here endeavor to determine congressional intention be-

cause of the lack of ambiguity in that section of the law and he was restrained from attempting to decide whether our public policy is being circumvented by the factual situation here presented. He concluded that the Government had not established by the required reasonable, substantial and probative evidence that when respondent procured his preference immigrant visa and first entered the United States he was other than "unmarried" and accordingly he is not deportable on the charge in the order to show cause nor upon the lodged charge. The special inquiry officer therefore terminated the proceedings.

We are not persuaded that the conclusion of the special inquiry officer is correct. The respondent, when he executed his immigrant visa application on April 2, 1963, submitted a certificate that he was "celibe" or single dated March 3, 1962 and was aware of the contents of Form FS-548 which warned the applicant that he would lose his quota preference status if he should marry prior to his application for admission at a port of entry into the United States and that he would then be subject to exclusion therefrom (Ex. 2). The respondent and his wife are both of the Catholic faith. The respondent testified that he had known his wife for five or six years before he married; that they had been engaged for two or three years previosuly; and that at the time he applied for his visa on April 2, 1963 he had already been married in church on December 27, 1962 at a time when his wife was pregnant. He admitted that subsequent to his marriage on December 27, 1962 he lived together with his wife as husband and wife, that their child was born June 5, 1963 and that he departed to the United States on July 6, 1963. He was aware that if he were to be married civilly he could not come to the United States. However, he prevailed upon the ordinary or bishop to delay the recording of the marriage, based upon his understanding that the marriage would have no civil or legal effect until it was so recorded. Therefore, we have a situation where the respondent was fully aware that he would be unable to come to the United States if he was married, that he underwent a religious marriage and lived together with his wife as husband and wife and had a child before he came to the United States.

When section 203(a)(3) of the Immigration and Nationality Act was amended by section 2 of the Act of September 22, 1959, 73 Stat. 644, by striking the word "children" and adding the phrase "unmarried sons or daughters," the recognized purpose of the amending bill (H.R. 5896) was "to reclassify close relatives of United States citizens and aliens admitted for permanent residence so as to

expedite-the reuniting of certain families."¹ It was explained that section 2 of the bill would grant third preference status to the unmarried sons and daughters, over 21 years of age, of lawfully residing aliens, a proposal based upon the belief that such unmarried children, although not minors, still belonged to the family unit.²

Thus, it is clear that Congress, in its amendment to Section 203 (a)(3), intended to benefit a primary family group, consisting of the mother, father and the unmarried sons and daughters. It seems equally clear that Congress did not intend to benefit one who, by entering into a marriage relationship while still in the foreign country, has voluntarily removed himself from that primary group. Congress did not intend that the benefits of third preference status extended to unmarried sons or daughters who were regarded as part of the primary family unit, were to be easily circumvented by an alien who entered into a marriage relationship which because of some technicality of foreign law did not become formally final until after the alien had been admitted as the unmarried son or daughter of a citizen or permanent resident alien. Thus, in passing on the question of whether an alien was entitled to a nonquota immigrant visa under Section 4 of the Immigration Act of 1924, as amended by the Act of May 29, 1928, which provided that the term "nonquota immigrant" included the wife or husband of a citizen of the United States, the Department of State concluded that in the absence of evidence of fraud or bad faith there would appear to be no reason for questioning the validity of a religious marriage when it is shown that an American citizen and alien woman have agreed to become man and wife; that the religious ceremony had been publicly performed in the celebration of such a contract, and that the parties have regarded themselves as married and thereafter assumed the duties and obligations of the marital status.³

Until 1929 there was only one type of marriage recognized for purposes of Italian civil law, namely, a civil marriage performed in accordance with the Italian law. In 1929 a treaty was concluded between the Vatican and the Italian State, known as the Lateran Pacts, the net effect of which was to bring the canon law into conformity with the requirements imposed by Title 6 of Book 1 of the Civil Code regarding marriages. From the provisions of Italian law it is a fair conclusion that until the religious ceremony is recorded the marriage is not, civilly speaking, complete. However,

¹ H.R. 582, 86th Cong., 1st Sess.
² 86 Cong. Rec. 12716 (1959).
³ See Opinion of the Secretary of State under date of September 22, 1932 in the case of *Loro, Gioannina Carpetta.*

it is also clear that the transcription into the register of vital statistics will always produce the civil effects from the day on which the marriage was performed (Ex. 7 & Ex. 8). It is apparent, and has been conceded by the expert witness except for certain cases not here relevant, that the recording of the religious marriage has a retroactive or *nunc pro tunc* effect as of the date of the religious marriage.

However, the Italian law nowhere provides that a religious marriage is invalid until it is recorded. Even though the marriage is not recorded, in order to be dissolved, it must be annulled. Article 14 of Law 847 provides that the marriage certificate may be recorded at any time by any interested person, even after the death of one of the parties. It is equally apparent that after the religious ceremony has been performed the parties are not regarded as living in sin. Thus, the marriage has both religious and civil effects, particularly in a religious country like Italy.

With regard to marriages and the effect to be given to them for immigration purposes, we have adopted a Federal policy of examining the marriage notwithstanding that such marriage is considered valid under the domestic law of the jurisdiction where performed. So, where an alien's marriage to a United States citizen female spouse was contracted solely to facilitate his admission to the United States, it did not entitle him to the issuance of a nonquota visa where no bona fide husband and wife relationship was intended and such marriage is deemed invalid for immigration purposes.[4] In the case of *United States* v. *Diogo*, 320 F.2d 898 (2d Cir. 1963) although the court refused to convict on a charge of false representation in violation of 18 U.S.C.A. 371, 1001 and 1546, the court nevertheless stated that Congress might adopt Federal standards of bona fides of marriage for the limited purpose of denying immigration priorities to persons whose marriages do not meet the standard; and that that standard embodied in congressional understanding of the terms "marriage" or "spouse" as they appear in immigration statutes is a relevant standard to apply in exclusion or deportation proceedings.[5] Thus, the courts have not been hesitant in applying a Federal standard for determining the validity of a marriage for immigration purposes even though under the domestic law of the jurisdiction where the marriage was performed such marriage was valid.

---

[4] *Matter of M—*, 8 I. & N. Dec. 217; *Lutwak* v. *United States*, 344 U.S. 604; *Giannoulias* v. *Landon*, 226 F.2d 356 (9th Cir. 1955); *United States* v. *Rubenstein*, 151 F.2d 915 (2d Cir., 1945), cert. den. 326 U.S. 766.

[5] See *Voliantis* v. *Immigration and Naturalization Service*, 352 F.2d 766 (9th Cir., 1965).

Interim Decision #1572

The question of the validity of religious marriages, in countries where recordation or registration is essential to their validity, has previously received consideration and they have been held to be valid in certain cases and invalid in others. Thus, where the evidence of record indicates that the foreign religious marriages were entered into in good faith and recognized by the parties thereto, the validity of the marriage was presumed in the absence of evidence to the contrary, reliance being had on the presumption in favor of the validity of a marriage and that the formalities of law have been complied with. Conversely, where the evidence of record indicated that the foreign religious marriage was not entered into in good faith or was not recognized by the parties thereto, the usual legal presumption was deemed to have been rebutted by such evidence of lack of good faith or nonrecognition and the marriage was deemed invalid. The philosophy underlying these holdings appears to stem from an opinion of the Solicitor of Labor of September 14, 1933, dealing with cases involving applications for certificates of derivative citizenship where it was stated that if the person has always believed that his parents were lawfully married and that he was a legitimate child, no public advantage would be gained from making a search of the laws of some foreign state in order to prove that his parents were living in sin and that he was a bastard. Generally, where parties have held themselves out to be man and wife, have lived together over a period of time and have considered themselves married, where there have been children born to the union, particularly where there has been the color of a marriage ceremony, for immigration purposes this is a good marriage, even though proof of its formal perfection may be lacking.[6]

In summary, the religious marriage of the respondent had no civil effect until recorded but such recordation made the marriage effective as of the date of the celebration of the religious marriage which was prior to the entry of the respondent into the United States. The intent of Congress in according third preference status to the "unmarried" son of a citizen or lawful resident alien makes it clear that Congress set up a Federal standard with regard to the term "unmarried," and that reference to foreign law cannot be used to defeat the clearly expressed congressional intent. The respondent was not, under Italian law, "unmarried" in the true sense of the word for immigration purposes when he applied for admission to the

[6] *Matter of K—*, 7 I. & N. Dec. 492 (Italy); *Matter of Duran-Montoya*, 10 I. & N. Dec. 767 (Colombia); also see unreported *Matter of Santorelli*, A-11476957 (August 24, 1962) (Italy); and unreported *Matter of Santoro*, A-12319034 (April 29, 1963) (Italy).

556

United States. He was fully aware that he was required to remain "unmarried" to continue to qualify for third preference status. The absence of a formal perfection of the marriage, under the circumstances present herein, will not be permitted to evade the intent of Congress. It is concluded that the respondent is subject to deportation upon the charge contained in the order to show cause and upon the lodged charge.

ORDER: It is ordered that the appeal of the trial attorney be sustained and that the respondent be deported to Italy pursuant to law upon the charge contained in the order to show cause and upon the lodged charge.