**Juana Estela CORNIEL-RODRIGUEZ, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 765, Docket 75–4096.**

United States Court of Appeals, Second Circuit.

Argued March 8, 1976.

Decided March 22, 1976.

---

302

Bernard Schwarz, New York City (Antonio C. Martinez, New York City, on the brief), for petitioner.

Mary P. Maguire, Sp. Asst. U. S. Atty. (Thomas J. Cahill, U. S. Atty., S. D. N. Y., on the brief, Thomas H. Belote, Special Asst. U. S. Atty., of counsel), for respondent.

Before KAUFMAN, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

It is, as Justice Cardozo stated long ago, a "fundamental and unquestioned" principle of our jurisprudence that "no one shall be permitted to . . . take advantage of his own wrong." *R. H. Stearns Co. v. United States*, 291 U.S. 54, 61–62, 54 S.Ct. 325, 328, 78 L.Ed. 647, 653 (1934). We are called upon to decide whether this venerable maxim should be invoked against the United States, to bar the deportation of a young and naive alien whose inadvertent violation of one sub-section of the Immigration & Nationality Act[1] was occasioned by the affirmative misconduct of American consular officers who failed to impart crucial information to her.

Specifically, Juana Corniel-Rodriguez claims that, when she received an immigrant visa in 1967 as the unmarried child of a United States resident, the American consul in Santo Domingo failed to warn her—as mandated by official State Department regulations—that her visa would automatically become invalid if she married before arriving in this country. Because she wed her childhood sweetheart, Evelio Rafael Marmolejo, three days before her departure from the Dominican Republic,[2] the Immigration & Naturalization Service (INS) now demands her deportation.

We believe that basic notions of fairness must preclude the Government from taking advantage of the consul's dereliction, and that a contrary result would work a serious and manifest injustice. We therefore grant Juana's petition for review and reverse the deportation order entered by the Board of Immigration Appeals.

I.

A brief recitation of the facts underlying this appeal is necessary to understand the process of balancing of equities in which we must engage.[3] The petitioner, daughter of Ricardo Corniel and his common-law wife Teodora Rodriguez, was born in the Dominican Republic in 1948. After Corniel married one Niels Liriano de Corniel, the six-year-old Juana was taken to live with her father and stepmother. In 1963, Juana's father was admitted to the United States for permanent residence, while his wife remained in the Dominican Republic to care

---

1. 8 U.S.C. §§ 1101 *et seq.*

2. It may seem unusual that the petitioner married a person ineligible for immediate admission to the United States so soon before she was to depart for this country. Her counsel explained, during argument before the Board of Immigration Appeals, that in the Dominican Republic—

> The custom was that after a person obtained a visa, in order to assure in the future reunification of two loved ones, they celebrated a marriage.

At her deportation hearing before a special inquiry officer, petitioner testified that she "thought that by marrying him that they would exempt us to be together." In any event, Corniel-Rodriguez has visited her husband in the Dominican Republic on several occasions since 1967, and has borne a child by him.

3. *See United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir. 1973); Note, *Emergence of an Equitable Doctrine of Estoppel Against the Government—The Oil Shale Cases*, 46 U.Col.L. Rev. 433, 451 (1975). *Cf. Union Oil Co. v. Morton*, 512 F.2d 743, 748 n.2 (9th Cir. 1975).

for young Juana. Corniel aspired, in a latter day variant of the American dream, to save enough money so that his wife and daughter could one day follow him to this country. In February, 1967, Niels Liriano de Corniel joined her husband in the United States, and Juana—then nineteen years old—applied to the American consulate soon after for a visa as a "special immigrant."

We pause here to describe briefly the somewhat convoluted provisions of the Immigration & Nationality Act governing eligibility for "special immigrant" status. Although the total number of aliens who may be issued immigrant visas in any year is limited to 170,000,[4] those born in the Western Hemisphere are eligible for "special immigrant" visas exempt from this ceiling if they first obtain a work permit from the Secretary of Labor.[5] But, the children of an individual who, like Juana's father, has already been admitted as a special immigrant are not required to obtain this labor certificate.[6] The children's exemption,

however, contains an odd limitation: it is unavailable if the alien is married *either* at the time of application for the visa *or* at the time of admission to the United States.[7]

The State Department was not unaware that this unusual provision might serve as a trap for the unwary. Accordingly, the Department in 1960 promulgated a regulation, 22 C.F.R. § 42.122(d) (modified in 1965), to protect minor aliens of marriageable age who might inadvertently forfeit their eligibility to enter our country in ignorance of this statute.[8] The Regulation provides in relevant part that

> The consular officer *shall* warn an alien [issued a visa as a child], when appropriate, that he will be inadmissible as such an immigrant if he is not unmarried at the time of application for admission. . . . [emphasis added]

A procedural note implementing the regulation provides that an alien of marriageable age to whom a visa has been issued on the basis of his or her status as a child should be given a special warning form, denomi-

---

4. 8 U.S.C. § 1151(a).

5. Section 101(a)(27)(A) of the Act, 8 U.S.C. § 1101(a)(27)(A), defines "special immigrant" as
   an immigrant who was born in any independent foreign country of the Western Hemisphere or in the Canal Zone and the spouse and children of any such immigrant, if accompanying, or following to join him: *Provided,* That no immigrant visa shall be issued pursuant to this clause until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 1182(a)(14) of this title. Section 212(a)(14) of the Act, 8 U.S.C. § 1182(a)(14) provides that individual aliens shall be ineligible to receive visas and shall be excludable from admission to the United States if they are
   Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working condi-

tions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to special immigrants defined in section 1101(a)(27)(A) of this title (other than the parents, spouses, or children of United States citizens or of aliens lawfully admitted to the United States for permanent residence) . . . .

6. *See* § 212(a)(14) of the Act, 8 U.S.C. § 1182(a)(14), *supra* note 5 (i.e., the portion within parentheses).

7. The requirements of 8 U.S.C. § 1182(a)(14)(A) apply "at the time of application for a visa and admission to the United States . . . ." Under § 101(b)(1) of the Act, 8 U.S.C. § 1101(b)(1), the term "child" is defined as "an unmarried person under twenty-one years of age . . . ."

8. Although no "legislative history" behind 22 C.F.R. § 42.122(d) has been adduced by the litigants, nor have we discovered any, no other rationale for the Regulation suggests itself. It is, moreover, inconceivable that such a warning would be required were it not intended to prevent the injustices which would result to the poor and uneducated immigrants unschooled in the myriad technicalities of the immigration laws and regulations.

nated "FS–548 (Statement of Marriageable Age Applicant)." The statement informs aliens, who are to acknowledge by signature having received the notice, that they will be ineligible for admission to the United States should they marry prior to entry. One copy of this form is to be attached to the immigrant visa; the other is to be affixed to the consular office file copy of the visa issued.[9]

On August 17, 1967, the U.S. consulate in Santo Domingo issued a special immigrant visa to Juana. As the unmarried minor child of a special immigrant, she was not required to obtain a labor certificate.[10] Although Juana therefore fell within the ambit of 22 C.F.R. § 42.122(d), the Government admits that a copy of Form FS–548 is not contained in her consular file, nor is one attached to her visa. Indeed, Juana testified at her deportation hearing in 1972 that she had never been given any warning—written or oral—as required by the State Department's official regulations. She asserted that had she been informed of the fatal effect marriage would have upon her admissability, she would have simply postponed her wedding for three days, and entered the United States in compliance with the statute. At some later time she would have met her fiancé Marmolejo in Puerto Rico and taken her wedding vows. Such a procedure, as the INS attorney conceded at

oral argument, would have been entirely within the law and would not have rendered the petitioner deportable. *See also* C. Gordon & H. Rosenfeld, 1 Immigration Law & Procedure § 2.4b.

The petitioner's mother was present at the hearing before the Immigration Judge. To expedite the proceedings, the INS attorney stipulated that Juana's mother would have testified that she accompanied the petitioner to the interview at the American consulate in Santo Domingo, and that no notice, oral or in writing, was given Juana regarding the effect on her immigration status of a marriage prior to entry.[11] Juana also sought, through her attorney, to corroborate her version of the consul's faulty procedures by compelling the testimony of the consular official who had issued the visa. The Immigration Judge, however, refused to issue the subpoena.[12]

Events subsequent to entry served to emphasize that, unfortunately, unintentional injustices too often can be visited upon the naive albeit honest alien who is understandably unfamiliar with the labyrinthine intricacies of our immigration laws. After becoming pregnant during a visit to her husband in 1969, Juana chose to bear the child in the Dominican Republic. Here too, just a smattering of correct information could have spared Juana her present unfortunate

---

9. *Matter of Polanco*, 14 I&N Dec. ——, Interim Decision # 2241 at 3 (B.I.A.1973).

10. The consular officer indicated on the visa that Juana Corniel-Rodriguez was within non-quota classification "SA–1." This is defined by 22 C.F.R. § 42.12(b) to encompass a "special immigrant" who is an "[a]lien born in [an] independent Western Hemisphere country." It is clear upon reading item # 34 on the visa, however, that the petitioner actually was granted the visa under "SA–3" ("Child of alien classified SA–1 (unless SA–1 in own right)"). After the words, "I claim to be exempt from ineligibility to receive a visa and exclusion under . . . .," the consular officer stamped upon the visa the legend, "Section 212(a)(14) of the Immigration and Nationality Act because my . . . father . . . is a United States . . . resident alien." (Other alternative formulations were listed, but the words "father" and "resident alien" were circled.) Indeed, it was only as the minor, unmarried child of a resident alien that the petitioner could

possibly be exempt from the labor certification requirement. We, therefore, reject as frivolous the INS argument, reminiscent of *Catch 22*, that the

> petitioner's reliance on 22 C.F.R. § 42.122(d) is entirely misplaced . . . [because the p]etitioner was not issued a visa based on her status as a 'child' but was issued her visa based on her status as a 'special immigrant' [citing, in a footnote, the SA–1 classification on the visa]. [INS Brief at 10.]

11. The attorney for the INS stated that in so stipulating he was not admitting the truth of such testimony. Although the INS has argued that failure to communicate the warning would not estop the Government from deporting the petitioner, the INS has refused to concede that no warning was given.

12. The special inquiry officer has the power to issue subpoenas. 8 U.S.C. § 1225(a).

plight. Had she given birth to her child in this country, she would have been the parent of a United States citizen, and thus exempted from the labor certification requirement under another provision of our immigration laws. *See* U.S. Const. amend. XIV; 8 U.S.C. § 1401(a)(1); 8 U.S.C. § 1182(a)(14).[13] This rather hapless failure to reap the benefits, within her grasp, of the Immigration & Nationality Act, lends support to Juana's claim of ignorance concerning other complex provisions of the Act.

Despite the accumulation of uncontradicted evidence to the contrary, it is puzzling that the Immigration Judge, in his oral decision, stated that he had "no doubt" that Juana had received the required warning. He premised this finding, not upon the witnesses' credibility (or lack thereof), but rather upon

> a presumption of official regularity which attached to the consular officer's issuance of the visa in question, including his compliance with the provisions of [22] CFR 42.122(d). [Juana] and her mother's self-serving statements to the contrary have not rebutted this presumption. . . .
>
> In any case, absence of the required warning does not affect illegality of such an entry. Therefore an application to subpoena the American Consul was denied.

The Board of Immigration Appeals dismissed the petitioner's appeal. The Board found it unnecessary to determine precisely what had transpired in the consul's office.

Rather, it believed that the Government could deport the petitioner even if the marriage warning had not been given. We cannot agree with this conclusion.

## II.

Deportation and denial of citizenship have, since ancient times, been among the most dreaded governmental sanctions. *See Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103, 2115 (1945). The courts, therefore, have been loath to interpret the Immigration & Nationality Act in a wooden fashion in those extraordinary cases in which such an unreflective approach would cause manifest and gross injustice.

An important illustration [14] of such a sensible and humane application of the law is the decision of the unanimous Supreme Court (Douglas, *J.,* concurring in result) in *Moser v. United States*, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951).[15] In that case, the United States was barred from denying citizenship to an alien from a "neutral country," who had claimed an exemption from military service during World War II. A provision of the Selective Training & Service Act of 1940 clearly stated that neutral aliens who applied for such exemptions thereby foreswore their right to naturalization. The Supreme Court held, nonetheless, that Moser had not knowingly waived his right to citizenship because he had reasonably relied upon a letter from the Swiss Legation which, based on ambiguous correspondence with the State Department, had

---

**13.** Counsel for the INS stated that Juana Corniel-Rodriguez would have had to return to the Dominican Republic and wait her turn in the "parent" category for entry. We express no views on this question which is, in any event, irrelevant to our decision.

**14.** 2 K. Davis, Administrative Law Treatise § 17.02 at 501. *See also* Comment, *Never Trust a Bureaucrat: Estoppel Against the Government*, 42 S.Cal.L.Rev. 391 n. 1 & 397 (1969).

**15.** Although Justices Black and Frankfurter believed it was unnecessary to reach several questions of statutory and treaty interpretation, they agreed fully with the portion of the

opinion we have discussed. While both *Moser* and the *Hibi* case (*see infra*) involved citizenship rights, we view the Court's treatment as fully applicable to immigration cases. *Accord, Santiago v. INS*, 526 F.2d 488, 492 n. 8 (9th Cir. 1975) (en banc). We are, of course, aware of the decision in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), but believe it to have been substantially undermined by *Moser. See United States v. Lazy FC Ranch*, 481 F.2d 985, 988–89 (9th Cir. 1973); *United States v. Wharton*, 514 F.2d 406, 411 (9th Cir. 1975); K. Davis, *supra* note 14, at § 17.02.

led him to misconceive the legal consequences of applying for the exemption.

■ Similarly, this court and others have held that the Government's improper actions may preclude it from deporting an alien, even if the language of the Immigration & Nationality Act, read *in vacuo*, might suggest a difference result. *Podea v. Acheson*, 179 F.2d 306 (2d Cir. 1950); *Tejeda v. INS*, 346 F.2d 389 (9th Cir. 1965); *McLeod v. Peterson*, 283 F.2d 180 (3d Cir. 1960); *Santiago v. INS*, 526 F.2d 488, 492 (9th Cir. 1975) (en banc) (dictum).[16]

In the case before us, a naive and poorly educated alien is alleged to be in noncompliance with a highly technical provision of the Act. But, that failure to comply would have been avoided if the American consular officer had adhered to the mandatory regulation enacted for the benefit of those who might find themselves charged with an unknowing and innocent violation of the Act. Because deportation is such a harsh sanction, we are certain that Congress would have approved the safeguards that the State Department built into the enforcement of the Act, particularly those that provide for appropriate notice to the unwary. We are equally certain that Congress would not have wished the Government's flouting of these regulations to occasion the banishment of a hapless alien from our shores.

### III.

The equities must always be carefully weighed in the context of the particular facts. In two citizenship cases, *Montana v. Kennedy*, 366 U.S. 308, 315 & n. 11, 81 S.Ct. 1336, 1341, 6 L.Ed.2d 313, 317 (1961) and *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7, 10 (1973) (per curiam), the Supreme Court has taken pains not to disturb several lower court holdings based on facts strikingly similar to those presented here. *Podea v. Acheson, supra*; cases discussed in *Lee You Fee v. Dulles*, 236 F.2d 885, 887

(7th Cir. 1956), *rev'd on other grounds*, 355 U.S. 61, 78 S.Ct. 138, 2 L.Ed.2d 106 (1957) (per curiam).

In *Podea*, this Court reversed a lower court determination that Podea had lost his citizenship by serving in a foreign army and swearing allegiance to a foreign potentate. Although the letter of the law clearly called for forfeiture of American nationality for this conduct, Podea had joined the Roumanian Army only after an erroneous State Department ruling that Podea already had lost his American citizenship and had become a Roumanian national because of certain prior acts. Under these circumstances, we rejected a "technical" application of the statute.

In *Lee You Fee*, the Court of Appeals for the Seventh Circuit informed us that

> Certainly the Government should not be heard to contend that a plaintiff had been deprived of his citizenship because of the failure of the plaintiff to do something which the officials of the Government had carelessly or willfully prevented his doing.

236 F.2d at 887. The cases upon which the Seventh Circuit based this view involved a statutory provision by which children born abroad, to a parent who was a U.S. citizen, would forfeit American citizenship unless they took up residence in the United States by their sixteenth birthday. Denial of citizenship was deemed improper in those cases where the child had made timely application but was prevented from entering the U.S. within the prescribed period by "the tardiness and unnecessary delay by officials of the consular office in issuing to the plaintiff the necessary travel orders." *Id.*

■ We believe that a similar result is required in the case before us. The failure to provide the warning mandated by 22 C.F.R. § 42.122(d) was fully as misleading as the misinformation given to Podea—and certainly as unjust and as seriously prejudicial to her interests. And, the official's noncompliance with an affirmatively re-

---

**16.** *See also* Gordon, *Finality of Immigration and Nationality Determinations—Can the Government Be Estopped?* 31 U.Chi.L.Rev. 433, 454 (1964).

quired procedure, obviously designed to protect individuals in Juana's precise situation, was at least as severe an act of affirmative misconduct, *Hibi, supra,* 414 U.S. at 8–9, 94 S.Ct. at 21–22, 38 L.Ed.2d at 10–11, as the unfortunate, but not otherwise proscribed, "tardiness and unnecessary delay" denounced in *Lee You Fee.* Indeed, since 22 C.F.R. § 42.122(d) was validly adopted, *see* 8 U.S.C. §§ 1104(a), 1201(a), it carries the force of law that must be respected and enforced by the Government. *See United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039, 1056–57 (1974); *Vitarelli v. Seaton,* 359 U.S. 535, 539–40, 79 S.Ct. 968, 972–73, 3 L.Ed.2d 1012, 1016–17 (1959); *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403, 1409 (1957); *U.S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 265–66, 74 S.Ct. 499, 502, 98 L.Ed. 681, 685–86 (1954); · *Hammond*

*v. Lenfest,* 398 F.2d 705, 715 (2d Cir. 1968).[17] To permit Juana to be deported, under these circumstances, would be to sanction a manifest injustice occasioned by the Government's own failures. *See Tejeda, supra,* 346 F.2d at 394.[18]

Accordingly, we grant the petition for review and reverse the order of deportation.[19]

---

**17.** For this reason, *Santiago, supra,* 526 F.2d at 493, and *Hibi, supra,* are clearly distinguishable. We note, moreover, that the cost of providing FS–548 forms to aliens such as Juana—which can be accomplished while they are physically present in the American consular offices—is negligible. This is in sharp contrast to the presumably excessive expense that would have been occasioned by the massive publicity campaign necessary to insure that all Filipinos, such as Hibi, who fought for the United States in the Second World War were fully informed of their rights under the Nationality Act of 1940.

It is interesting, moreover, to examine the three decisions cited in the Board's ruling we review today which it asserts stand for the principle that "even if the holder of a visa does not know that the marriage invalidates her visa and practices no fraud or concealment, she is nevertheless deportable." In each of these Board-cited cases, the Board indicated that the receipt of FS–548 forms properly signed by the aliens was a persuasive factor. *Matter of C——,* 8 I&N Dec. 665, 667–69 (B.I.A.1960); *Matter of Coletti,* 11 I&N Dec. 551, 553 (B.I.A. 1965); *Matter of Rodriguez,* 13 I&N Dec. 746, 748 (B.I.A.1971).

**18.** We do not, of course, suggest that noncompliance with any regulation, no matter how minor its impact or importance, will automatically prevent the Government from deporting an illegal alien. Our holding is limited to the extraordinary circumstances before us. Indeed, the State Department can readily avoid a recurrence of this situation simply by supplying Form FS–548 routinely to individuals in Juana's position when they apply for immigration visas.

**19.** It is, in our view, unnecessary to remand for further evidence on the issue whether petitioner actually received the warning required by 22 C.F.R. § 42.122(d). Her own uncontradicted testimony, and that of her mother, was confirmed by the unexplained absence of a Form FS–548 from her consular file. And it is, perhaps, not insignificant that petitioner sought the testimony of the American consul in Santo Domingo, while the INS—which might also have applied for a subpoena—did not. Finally, of course, Juana's account was inherently credible. An individual aware of the non-marital requirement would not jeopardize her ability to enter and remain in the United States by marrying three days before her admission—and then flaunt her alleged "violation" by returning to her native land several times to see her husband and to bear their child. It is inconceivable that such a foolhardy course would be followed when an interest as precious as American residency hung in the balance.

The Government, moreover, was afforded an opportunity to present its own witnesses and to cross-examine Juana and her mother at the hearing before the Immigration Judge. We believe, therefore, that a remand would serve no purpose.