UNITED STATES of America, Plaintiff-Appellee,

v.

RUBY COMPANY, a Utah Corporation, et al., Defendants-Appellants.

No. 75–1411.

United States Court of Appeals, Ninth Circuit.

Nov. 8, 1978.

Rehearing and Rehearing En Banc Denied Dec. 29, 1978.

---

H. William Furchner (argued), of Furchner, Martsch & Baker, Blackfoot, Idaho, Dale G. Higer (argued), Boise, Idaho, for defendants-appellants.

Michael A. McCord, Atty. (argued), Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before ELY and WALLACE, Circuit Judges, and BYRNE,* District Judge.

WALLACE, Circuit Judge:

Appellants are landowners against whom title was quieted to some 108.36 acres of land in Idaho. They raise contentions regarding sufficiency of the evidence and important questions concerning the doctrine of estoppel and its application to the government. We affirm.

In 1876, David contracted with the United States to survey certain lands situated along the Snake River in Idaho. As part of his task, David was required to determine the location of the river and to represent its situs by establishing meander lines. David completed his survey in April 1877. On the basis of his efforts, an official plat of the area was prepared and certified by the Surveyor General's Office at Boise, Idaho.

On June 29, 1891, the United States issued a patent to Forbes which conveyed a particular lot, the east boundary of which is

* Honorable William Matthew Byrne, Jr., United States District Judge, Central District of California, sitting by designation.

described as the meander line of the Snake River. The landowners are successors in interest of the original patentee.

In 1922, the Bureau of Land Management (BLM) made an investigation of the meander lines of the Snake River as represented by the David survey. The BLM concluded that David's meander line was fraudulent. As a result, the Surveyor General of Idaho recommended that a proper survey be made. In 1923, the General Land Office of the Department of Interior disapproved the recommendation.

In 1957, the BLM ordered a survey of the lands bordering the Snake River lying within the meander lines of the David survey. On the basis of this survey, the BLM concluded that the meander lines of the David survey were grossly erroneous. The variance in the actual position of the river banks and their position as represented by David resulted in some fourteen to sixteen thousand acres being omitted from the original survey. These omitted lands lie between the river's actual bed and David's meander lines.

The United States brought suit to quiet its title in the omitted lands.[1] The landowners counterclaimed, praying that title be quieted in them. After a protracted period of delays and litigation, the district court entered judgment in favor of the United States.

I

■ The landowners' contentions arise primarily out of the application of the principle of conveyancing that the transferee of a parcel of real property, which is described as bounded by a body of water, takes title up to the actual water line. Thus, in the case of a federal land patent, the patentee takes title up to the actual water line, even though the survey on which the patent is based inaccurately depicts the position of the river. The underlying theory is that the surveyor's meander line is primarily used as an aid in calculating the size of the tract and does not independently operate to determine the dimensions of the conveyance. *Producers Oil Co. v. Hanzen,* 238 U.S. 325, 339, 35 S.Ct. 755, 59 L.Ed. 1330 (1915); *Horne v. Smith,* 159 U.S. 40, 42, 15 S.Ct. 988, 40 L.Ed. 68 (1895); *Railroad Co. v. Schurmeir,* 74 U.S. (7 Wall) 272, 286–87, 19 L.Ed. 74 (1869).[2] Based upon this legal premise, the landowners argue that the original patentee acquired title up to the actual bank of the Snake River and that the present landowners, whose titles are derived from the patentee via intermediate conveyances, have title up to the actual water line.

■ There is, however, a second relevant principle of conveyancing which is an exception to the first. According to this limitation, when fraud or gross error causes severe inaccuracies in the position of the meander lines, the patent conveys only up to the meander line. Consequently, title to the lands lying between the fraudulent or grossly erroneous meander line and the actual water line remains the property of the United States. *Jeems Bayou Fishing & Hunting Club v. United States,* 260 U.S. 561, 564, 43 S.Ct. 205, 67 L.Ed. 402 (1923); *Lee Wilson & Co. v. United States,* 245 U.S. 24, 29, 38 S.Ct. 21, 62 L.Ed. 128 (1917); *Security Land and Exploration Co. v. Burns,* 193 U.S. 167, 180–83, 24 S.Ct. 425, 48 L.Ed. 662 (1904). The policy underpinnings of this rule are twofold. First, the patentee still receives all that was bargained or paid for since he or she receives the same size tract actually calculated and described in the patent. Second, policy disfavors binding the citizens generally by the fraudulent acts of a public official.[3]

1. Although the lands omitted by the David survey constitute some 14,000 to 16,000 acres, this suit pertains to only 108.36 acres.

2. The classic statement of this rule appears in *Horne v. Smith, supra,* 159 U.S. at 42, 15 S.Ct. at 989: "[A] meander line is not a line of boundary, and . . . a patent for a tract of

land bordering on a river conveys the land, not simply to the meander line, but to the water line . . . ."

3. As the Supreme Court explained,
[g]iving the patentees all the land in acres, stated in the patents and described and contained in lines and distances in such patents,

In the present case, the district judge concluded that the David survey of 1877 was "grossly erroneous." Therefore, under the principles discussed above, the original patent would have conveyed the land only up to the fictitious meander line.

■ The landowners attack the factual premise of the district court's decision, contending first that the David survey was not grossly erroneous and, second, that any lands lying between the meander lines and the stream bed have been exposed by reductions in the volume of the Snake River since the time of the David survey. Under this second contention, the landowners claim title to these newly-exposed lands pursuant to the doctrine of reliction.[4]

■ These factual attacks must be considered in light of the rule that the district court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witness." Fed.R.Civ.P. 52(a). From our examination of the record, we cannot conclude that the district judge was clearly erroneous when he found that the David survey was "grossly erroneous."[5] Accordingly, the case falls within the exception to the general rule and the title to the omitted

lands remains with the people of the United States.

## II

This factual decision does not end our inquiry because the landowners' central contention is that the equitable principles of estoppel should operate to prevent the government from asserting ownership rights in the disputed lands. This argument is based essentially on four assertions: (1) the government became aware of the fraudulent survey as early as 1922, (2) the landowners and others relied on the government's refusal to resurvey after the 1922 investigation, (3) the landowners acted in good faith without notice of the erroneous nature of the survey, and (4) the landowners and their predecessors relied on the David survey.

The landowners raised this argument in the trial court and the district judge specifically found that all of the elements of estoppel were established by a preponderance of the evidence. Nevertheless, he concluded "as a matter of law that estoppel will not lie as to the United States." We disagree.

■ We are not unmindful of the well-worn statement that the government is not

---

and which is all they paid for, protects them, and the government ought not to be further concluded by the fraudulent acts of a public officer.
*Security Land & Exploration Co. v. Burns,* 193 U.S. 167, 182–83, 24 S.Ct. 425, 429, 48 L.Ed. 662 (1904).

4. Under the general application of this doctrine, land which becomes exposed by the gradual recession of water belongs "to the riparian owner from whose shore or bank the water has receded . . . ." 93 C.J.S. *Waters* § 78 (1956). *See also* the second *Report of the Special Master, Utah v. United States,* 427 U.S. 461, 96 S.Ct. 3187, 49 L.Ed.2d 625 (1976), *published in* 1976 Utah L.Rev. 245, 267–69.

5. Our review of the record convinces us that the district judge correctly concluded that the David survey was grossly inaccurate. For example, the tract of land involved in this case is bounded on the southeast by the Snake River. Calculating the acreage of the tract by using David's meander line as the southeast boundary, the tract contains 38.47 acres. However,

using the actual water line of the Snake River, the size of the tract contains an additional 108.36 acres.

Perhaps most revealing is the evidence summarized by the district court's Finding of Fact No. 11:

A comparison of the David survey with the 1957 survey produces further enlightening evidence. It is demonstrated that where David's meander lines crossed section lines the David meander lines coincide with present-day meander lines of the river with marked consistency. However, between section lines, the David meander lines frequently vary greatly from the presently located meanders. I find it most unlikely that the course of the river has changed only between section lines.

In addition, David's field notes indicate that he completed the survey of the relevant portions of the Snake River in two days. The government established by uncontradicted evidence that this feat was a physical impossibility.

subject to the equitable defense of estoppel. *Utah Power & Light Co. v. United States,* 243 U.S. 389, 408–09, 37 S.Ct. 387, 61 L.Ed. 791 (1917); *Pine River Logging Co. v. United States,* 186 U.S. 279, 291, 22 S.Ct. 920, 46 L.Ed.2d 1164 (1902); *Lee v. Munroe,* 11 U.S. (7 Cranch) 366, 3 L.Ed. 373 (1813). Our reading of the more recent decisions, however, leads us to conclude that this rule is no longer absolute.

In *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), for example, a Swiss national sought an exemption from military service pursuant to the terms of a Swiss-United States treaty. The Selective Service Act provided, however, that individuals who claimed exceptions as neutral aliens would thereafter be debarred from obtaining United States citizenship. In response to an inquiry by the Swiss Legation, the State Department "led [Moser] to believe" that he could take advantage of the treaty without prejudicing his rights to citizenship. The Supreme Court noted that the government had created "misleading circumstances" upon which Moser "justifiably relied" and as a result was technically debarred from citizenship. On these facts, the Court refused to allow the government to deny Moser citizenship. While the *Moser* opinion is not cast in terms of estoppel, it has been broadly interpreted as allowing the government to be estopped. *See, e. g.,* 2 K. Davis, Administrative Law Treatise § 17.02, at 491 (1958); Comment, *Santiago v. Immigration and Naturalization Service—The Ninth Circuit Retreats from its Modern Approach to Estoppel Against the Government,* 1976 Utah L.Rev. 371, 377.

A decade later, the Supreme Court commented that some lower federal courts had specifically allowed estoppel against the government based on the conduct of its officials. *Montana v. Kennedy,* 366 U.S. 308, 314–15, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961). However, the Court did not reach the estoppel question itself.

In *Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), a Filipino alien requested naturalization under the Nationality Act of 1940 which provided for the naturalization of aliens who served honorably in the United States armed forces during World War II. Under the terms of the act, however, Hibi was required to petition for naturalization prior to 1947 and while still in active service. Unaware of these limitations, Hibi filed his petition long after expiration of his eligibility. Hibi then argued that the government should be estopped from adhering to the statutory time limit on the basis of the government's failure to advise him of his rights and failure to provide a naturalization official in the Philippines during the period of his eligibility.

The Court noted that its opinion in *Montana v. Kennedy, supra,* had left open the question of whether the government might be estopped on the basis of its "affirmative misconduct." The Court held that no such affirmative misconduct was present in *Hibi.* In so doing, however, the Court apparently agreed that affirmative misconduct might give rise to an estoppel against the government. *See Santiago v. Immigration and Naturalization Service,* 526 F.2d 488, 492 n. 9 (9th Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

Clearly, these cases do not fully describe the dimensions of government estoppel. Nevertheless, we conclude from them that the Supreme Court has rejected the contention that under no circumstances may estoppel lie against the government.

In a recent series of important cases, we have explained the availability of government estoppel. In *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir. 1970), we specifically considered the applicability of estoppel to the government. After a thorough review of the authorities, we held:

> One commentator has summarized the law in this area by saying that, "The claim of the government to an immunity from estoppel is in fact a claim to exemption from the requirements of morals and justice." We agree, and we find that the dictates of both morals and justice indicate that the Government is not entitled

to immunity from equitable estoppel in this case.

*Id.* at 103.

Since then, we have strictly adhered to our position taken in *Georgia-Pacific.* In *United States v. Lazy FC Ranch,* 481 F.2d 985 (9th Cir. 1973), we further explained two important aspects of this doctrine. First, we pointed out that since estoppel is an equitable doctrine, it should be applied "where justice and fair play require it." As applied to the government, it requires a balancing test. On the one side, the court must weigh the tendency of "the government's wrongful conduct . . . to work a serious injustice . . . ." Against this consideration, the court must balance the countervailing interest of the public "not [to] be unduly damaged by the imposition of estoppel." *Id.* at 989. These policy factors may militate against application of estoppel even though the technical elements of the doctrine are present. Second, we observed that some courts have developed a dichotomy which allows estoppel against the government when based on "proprietary conduct," and disallows estoppel based on conduct resulting from the government's "sovereign" functions. In *Lazy FC Ranch* we rejected this distinction. *Id.* at 989, n. 5. In *United States v. Wharton,* 514 F.2d 406 (9th Cir. 1975), a case involving title to public lands, we explicitly reiterated our position that estoppel may be applied against the government even when acting in its sovereign capacity. *Id.* at 410.

▮ In *Santiago v. Immigration and Naturalization Service, supra,* 526 F.2d 488, we once more recognized that estoppel may lie against the government. In addition, we expressly embraced the implication of *Hibi* that estoppel "can only be invoked if the governmental conduct complained of amounts to 'affirmative misconduct' . . ." *Id.* at 491. In that case, the issue of whether the government conduct must be affirm-

ative was placed directly before our court en banc. Having resolved that important policy issue, we would fail to conform to the spirit of the precedent set in *Santiago* were we to limit the rule to immigration cases. Indeed, logic tells us there is no less reason for its application here than in *Santiago.* Thus we hold that the governmental action upon which the landowners wish to charge estoppel must be based upon affirmative misconduct.[6]

▮ Having arrived at this point, we ordinarily would reverse and remand with instructions to the district court to reconsider the applicability of the estoppel doctrine. However, the district court found as a matter of *fact* that each of the elements of estoppel was established by a preponderance of the evidence. While the establishment of the elements may require a factual determination, the nature of the elements themselves raises questions of law.

▮ We have outlined the ordinary elements of estoppel as:

(1) The party to be estopped must know the facts;

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) The latter must be ignorant of the true facts; and

(4) He must rely on the former's conduct to his injury.

*United States v. Wharton, supra,* 514 F.2d at 412; *United States v. Georgia-Pacific Co., supra,* 421 F.2d at 96.

▮ However, in this case, the formulation of the necessary elements of estoppel must be modified in light of the "affirmative misconduct" limitation expressed in *Santiago.* As a result, the elements must be read as requiring an affirmative misrep-

---

**6.** *See California Pac. Bank v. Small Business Admin.,* 557 F.2d 218 (9th Cir. 1977); *Sun Il Yoo v. Immigration & Naturalization Serv.,* 534 F.2d 1325 (9th Cir. 1976); *In re Naturalization of 68 Filipino War Veterans,* 406 F.Supp. 931 (N.D.Cal.1975). *Cf. Corniel-Rodriquez v. Immi-* *gration & Naturalization Serv.,* 532 F.2d 301 (2d Cir. 1976); *Peignand v. Immigration & Naturalization Serv.,* 440 F.2d 757 (1st Cir. 1971); *United States v. Benitez Rexach,* 411 F.Supp. 1288 (D.P.R.1976).

resentation or affirmative concealment of a material fact by the government. *Cf. United States v. 31.43 Acres of Land,* 547 F.2d 479, 482 (9th Cir. 1976); *United States v. Wharton, supra,* 514 F.2d at 412.

 Having identified the estoppel elements, we now apply the law to the facts. Based on our review of the district court's findings and the record as a whole, we find no affirmative act of misrepresentation or affirmative act of concealment upon which to base an estoppel. Certainly, the misconduct of David, the contract surveyor, is not sufficient. If it were, the rule of law discussed above, that a grossly erroneous meander line will not operate to convey property omitted as a result thereof, would be completely eliminated. In addition, there is no evidence that the government, at any time after becoming aware of the inaccurate survey in 1922, sought affirmatively to conceal or to misrepresent the true facts.

The district judge apparently believed that an estoppel could be based on the Interior Department's initial decision not to resurvey immediately after the 1922 investigation. Though the decision may be affirmative conduct, it is clear that it was not *misconduct.* In its disapproval of the Surveyor General's recommendation to resurvey, the Interior Department clearly announced the nature and basis of its decision. First, the Department stated that one reason for the disapproval was that "the investigation survey [did not] support, beyond question . . . that the original survey was fraudulent." Second, the Department stated that it did "not think that there is justification for raising a question as to riparian rights at this time." Finally, Interior stated that the investigation survey

was to be filed in the office of the Surveyor General of Idaho "until such time as circumstances should develop the necessity for its revival."

Thus, the Interior Department candidly and forthrightly announced that its decision not to resurvey was based on the inconclusive nature of the investigative survey. The Department was careful to point out, however, that the David survey was not beyond question and that its decision not to resurvey would be reexamined when future circumstances so dictated.

Certainly this authorized administrative decision did not constitute a misrepresentation, concealment or other form of *misconduct* necessary to support an estoppel against the government. *Santiago v. Immigration and Naturalization Service, supra,* 526 F.2d at 493.[7]

 It could be argued that there are some broad principles of equity which might assist the plight of the landowners in this case. But we have found no case which would allow the application of estoppel when there has been a failure of proof as to the required elements.[8] Indeed, the equitable discretion seems to cut only in the other direction. That is, the court can refuse to apply the doctrine when equity-policy considerations so demand,[9] even though the technical elements may be present. While we recognize that we have held that estoppel may lie in cases involving title to public lands, we are also aware that policy considerations demand that it not be so applied without compelling reasons. This principle is a corollary to the constitutional precept that public lands are held in trust by the federal government for all of the people. U.S.Const. art. IV, § 3; *see United States v.*

---

7. Our Brother Ely argues that the government's conduct here was in fact "affirmative" as required by *Santiago.* This argument, of course, misses the point. *Santiago* also requires that the government's action be "misconduct" in order to support the estoppel. We cannot find any misconduct in the Interior Department's declination to resurvey immediately after the investigation. In essence, the position urged by the dissent would require us to ignore the plain meaning of *Santiago.*

8. *See Emergence of an Equitable Doctrine of Estoppel Against the Government—The Oil Shale Cases,* 46 Colo.L.Rev. 433, 451 (1975). *See generally* 3 J. Pomeroy, Equity Jurisprudence §§ 801 *et seq.* (5th ed. 1941).

9. The government should be estopped *only* if policy and equity considerations so demand. *Union Oil Co. v. Morton,* 512 F.2d 743, 748–49 n. 2 (9th Cir. 1975); *United States v. Lazy FC Ranch, supra,* 481 F.2d at 989.

*California,* 332 U.S. 19, 40, '67 S.Ct. 1658, 91 L.Ed. 1889 (1947). Thus, while one may be sympathetic with the landowners in this case, we must not be unmindful that the land involved belongs to all the people of the United States. Therefore, even if the landowners had proven all the elements necessary for estoppel, they would additionally need to demonstrate such equities which, on balance, outweigh those inherent equitable considerations which the government asserts as the constitutional trustee on behalf of all the people.[10]

### III

The landowners also claim that the trial court erred by quieting title to the disputed lands in the government in contravention of 43 U.S.C. § 772 (1970).[11] We find no merit in this contention.

This statute is designed to allow the Interior Department to conduct *resurveys* or *retracements* of surveys in order to mark properly the boundaries of public lands. The statute further provides that such resurveys may not impair "bona fide rights or claims" of owners of lands affected by the resurvey. Under the rule of *Jeems Bayou, supra,* 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402, the lands here involved were "omitted" by the fraudulent survey. These lands were, by definition, unsurveyed lands until surveyed for the *first* time in 1957. Thus, Section 772 is simply not applicable.

The landowners' final contention is that the doctrine of estoppel by deed operates to prevent the government from asserting its title to the omitted lands. We consider this doctrine inapplicable to the present case in light of *Jeems Bayou.* The patentee's deed was based upon the David survey. However, the fraudulent or grossly erroneous nature of this survey resulted in the deed only conveying title up to a line represented by David's fraudulent meander line. The disputed lands lying between the fraudulent meander line and the actual water line were not conveyed by the patent and thus remain in the public domain. To hold the government estopped by the deed based on the fraudulent survey would destroy the important rule announced in *Jeems Bayou.*

AFFIRMED.

ELY, Circuit Judge, dissenting:

I respectfully dissent. As I see it, the result reached by my Brothers is not only unjust, but also, that result is not legally required.

In Part II of its opinion, the majority concludes that estoppel is not here applicable against the Government because the Government committed no affirmative misconduct. I have no quarrel with my Brothers' statement as to the basic legal principle that should be applied. It is now clear beyond question that the law of our circuit

---

**10.** In our view, this equity-policy consideration is also dispositive of another of the landowners' contentions. They argue that the lapse of time since 1922 when the government was put on notice of the inaccuracy of the David survey requires application of the doctrine of laches.

The traditional rule is that the doctrine of laches is not available against the government in a suit by it to enforce a public right or protect a public interest. 30A C.J.S. *Equity* § 114 (1965). It may be that this rule is subject to evolution as was the traditional rule that equitable estoppel would not lie against the government. However, in the analogous estoppel situation, the invocation of the doctrine against the government requires a showing of affirmative misconduct. Even if there were some allowance for laches against the government, there is no reason why that doctrine should not be subject to at least the same

strictures as estoppel. In any event, on the facts of this case, we deem the policy considerations so strong as to compel denial of the defense of laches.

**11.** 43 U.S.C. § 772 states in part:

The Secretary of the Interior may, as of March 3, 1909, in his discretion cause to be made, as he may deem wise under the rectangular system on that date provided by law, such resurveys or retracements of the surveys of public lands as, after full investigation, he may deem essential to properly mark the boundaries of the public lands remaining undisposed of: *Provided,* That no such resurvey or retracement shall be so executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected by such resurvey or retracement.

requires a showing of affirmative misconduct before the Government may be estopped. *California Pac. Bank v. Small Business Admin.,* 557 F.2d 218, 224 (9th Cir. 1977); *Santiago v. I&NS,* 526 F.2d 488, 491–93 (9th Cir. 1975) (en banc), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). It is the majority's application of the principle that I deeply feel to be thoroughly wrong.

As written by our Brother Choy, with whose perceptive comments I recently joined in *Santiago,* " '(a)ffirmative' and 'negative,' like 'misfeasance' and 'nonfeasance,' are indeed slippery terms. Each one of the claims paraphrased negatively can readily be restated affirmatively . . . . But it is not *how* we cast the facts, but the facts themselves that should dictate the nature of relief warranted." *Santiago v. I&NS, supra,* at 495 (emphasis in original). Our decisions in this area have indicated that reasonable flexibility is not only desirable, but also is required. This is so that estoppel against the Government may lie "where justice and fair play require it." *United States v. Lazy FC Ranch,* 481 F.2d 985, 988 (9th Cir. 1973). Estoppel, as all know, is an equitable doctrine, designed to protect the legitimate expectations of those who have relied to their detriment upon the conduct of another. *Russel v. Texas Co.,* 238 F.2d 636, 640 (9th Cir. 1956), *cert. denied,* 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957). Consequently, we should be reluctant to circumscribe the technical requirements for invoking it so narrowly and harshly as to eviscerate its beneficent protections and purposes. As my Brothers appropriately say, courts remain free to reject the application of estoppel to the Government, even though the required elements are present, when, in the exercise of their equitable discretion, they find that countervailing reasons of public policy so require. It seems anomalous, however, to define the elements of estoppel so strictly that the doctrine is stripped of its equitable underpinnings and made less accessible to those whom it is designed to protect. Accordingly, I cannot agree that the Government's conduct here was anything short of "affirmative."

The 1922 BLM investigation of the meander lines of the Snake River as represented by the David survey, 31 years after the issuance of the land patent, resulted in a conclusion that the meander line was fraudulent. Based on that investigation, the Surveyor General of Idaho recommended that another survey be made. Nevertheless, in 1923, fully apprised of all the facts, the General Land Office of the Department of the Interior consciously and deliberately disapproved the recommendation, allowing the David survey to stand unchallenged. As I see it, the Government, by this conduct, effectively represented to all interested parties that the David survey could be taken as authoritative and would facilitate the proper and secure passage of title. To characterize this conduct as no more than a "decision . . . to take no affirmative action" seems to me to be an elevation of semantic distinction over reality. To reach its result, the majority plays with words and writes a tragedy. The Government, with full knowledge of the BLM investigation and the Surveyor General's recommendation, affirmatively acted by refusing to resurvey the disputed area. In making such a significant policy decision, the Government's conduct was no less affirmative simply because the outcome of its decision was a refusal to survey.[1] Restated, the Government did not unassertively refuse to act; rather, in fact, it acted positively and decisively even though its act was not to proceed further. Moreover, not until 1957, some 34 years later, did the Government evidence any intent to dispute the validity of the David survey. Again, the United States delayed, not bringing its suit to quiet title until eight more years had gone by. The position taken by the Government in 1965, when its suit was instituted, directly contradicted its representation in 1923 that

---

1. My Brothers do not really challenge my proposition that the Government's conduct was affirmative. Their lack of conviction as to this is demonstrated by their writing, equivocally, "though the decision may be affirmative conduct . . . ."

the accuracy of the David survey would not be challenged. If the Government's current position, first urged in 1965 and upheld by the District Court and now by this Court, is correct in that the original, ancient survey was grossly erroneous, then the 1923 action of the Government in representing the David survey as reliable clearly constituted a misrepresentation, and, in fact, a misrepresentation by affirmative conduct. Thus, speaking frankly, I simply cannot understand how the majority can hold that, in reality, the Government was not guilty of "affirmative misconduct." And the majority's bare conclusion that the conduct in this case is "clearly less egregious than the alleged misconduct in *Santiago*" adds nothing of substance to its rationale. Furthermore, the conclusion is mistaken. In *Santiago,* the conduct in question was merely the careless actions of immigration officials in validating the entry visas of otherwise excludable aliens. Here, we deal, not with carelessness, but with the most conscious and deliberate conduct on the part of the Government. While the facts of *Santiago* may be more "egregious" than those at hand here in that they implicated a human right and not a property right, I cannot at all see that the conduct in *Santiago* was any more affirmative than the conduct of the Government in this case. In truth and fact, it was much less affirmative.

While I am not unmindful of the majority's admonition that the public land belongs to the people of our country, I am unwilling to subvert the legitimate expectations and equities of the innocent landowners in our case by uttering generalized platitudes about the public welfare. These landowners and their predecessors in interest relied upon the accuracy of the David survey for over 60 years before the Government undertook to divest their title. To me, this concatenation of circumstances, taken as a whole, seems virtually intolerable from the standpoint of equity. Moreover, I do not see that the national interest will "be unduly damaged by the imposition of estoppel." *United States v. Lazy FC Ranch, supra,* at 989. The concurrence of the Government's affirmative misconduct and the overwhelming equitable considerations favoring the landowners drives me to believe that the Government's misrepresentation that it had abandoned all claims, allowed to go uncorrected for so many years, should prevent the abuse that it has, in this case, visited upon some of its people.

Regardless of so-called public interest, our Country was founded upon the ideal that every citizen was a sovereign in his own right, and that one of them, even though only a poor householder on the bank of a stream, should never again live under the threat of authoritarian abuse and mistreatment. Now, while we profess outrage at what we see as inhumanitarian treatment of powerless peoples in some parts of the world, our court permits our own Government, supposedly benevolent, to void a patent it issued 86 years ago and, as to its validity, reaffirmed 32 years later. And to what end? That it regain title to lands, insignificant to the Government in area and long thought to be vested in a few private individuals. The tragic price of conferring this relatively inconsequential benefit on the Government is the enforced eviction of the innocent appellees and their families from their homelands. This injustice my Brothers do under what they perceive to be "the countervailing interest of the public". I decry that approach, believing that the truest, most immutable interest of the American public is the protection of individual citizens in their property rights, as in their personal rights, and the unswerving resistance to the type of governmental deception, abuse, and intrusion that we ordinarily associate with totalitarian regimes.

I would reverse.